## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RISE ECONOMY,
77 Van Ness Ave., #101 – 1312
San Francisco, CA 94102,

NATIONAL COMMUNITY
REINVESTMENT COALITION,
740 15th Street, NW, Suite 400
Washington, DC 20005,

MAIN STREET ALLIANCE,
909 Rose Ave., Suite 400
North Bethesda, MD 20852,

and

RESHONDA YOUNG,
237 Prospect Ave.
Waterloo, IA 50703,

       *Plaintiffs*,

  v.

RUSSELL VOUGHT, Acting Director,
Consumer Financial Protection Bureau,
In His Official Capacity,
1700 G Street NW
Washington, DC 20552,

and

CONSUMER FINANCIAL PROTECTION
BUREAU,
1700 G Street NW
Washington, DC 20552,

       *Defendants*.

No. ___

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

Plaintiffs Rise Economy, National Community Reinvestment Coalition ("NCRC"), Main

Street Alliance ("Main Street"), and ReShonda Young, bring this action for declaratory and injunctive relief against Russell Vought, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, and the Consumer Financial Protection Bureau (collectively, "CFPB" or "Bureau"), and allege as follows:

## I.    INTRODUCTION

1.      Nearly fifteen years ago, in response to one of the most dire financial crises in our nation's history, Congress determined that the financial system had operated in an unsafe, reckless, and unfair manner, without adequate safeguards for people and communities impacted by its excesses or excluded from opportunities for credit. To that end, among numerous reforms, Congress included a straightforward requirement to enhance transparency: it enacted Section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (codified at 15 U.S.C. § 1691c–2), which amended the Equal Credit Opportunity Act, to require CFPB to collect data from financial institutions on loans to women-owned, minority-owned, and small businesses, and make it available to any member of the public.

2.      As CFPB itself has recognized, women-owned businesses, minority-owned businesses, and other small businesses (as defined by 15 U.S.C. § 632(a)), including small farms, often face more challenges to accessing credit than their counterparts.[1] And, small businesses are "critical to an innovative and dynamic economy."[2] They provide work for about half of all employees in the private sector, and estimates suggest "they have created two out of every three

---

[1] Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), 88 Fed. Reg. 35150, 35165 (Mar. 30, 2023) (the "Lending Transparency Rule").

[2] CFPB, *Key Dimensions of the Small Business Lending Landscape* 10–11 (2017), https://perma.cc/ANB7-VQZ3 ("*Key Dimensions*").

jobs since 1993."[3] Family farms with annual gross sales under $500,000 made up 91% of America's 2.2 million farms in 2016.[4] "[T]he financial health of small businesses," CFPB emphasized, "is essential to the U.S. economy."[5] Congress thus required covered institutions to collect data on small business lending applications for two key purposes: (1) to "facilitate enforcement of fair lending laws," and (2) to "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses."[6]

3.     The benefits of collecting data on loans to communities seeking enhanced access to credit are clear:  the data collected pursuant to Section 1071 is critical to understanding how small business credit flows into local communities and identifying "credit deserts," or places where credit flow is restricted.[7] "Women-owned, minority-owned, and LGBTQI+-owned small businesses have smaller cash reserves on average, leaving them less able to weather credit crunches."[8] As a result, many such businesses "may have a greater need for financing in general and particularly during economic downturns."[9] Section 1071 data is intended to "provide opportunities for community development lending," and it "may be particularly important to support fair lending analysis and enforcement."[10]

---

[3] *Id*. at 11.

[4] Lending Transparency Rule, 88 Fed. Reg. at 35156.

[5] *Id.*

[6] *Id*. at 35150.

[7] *Key Dimensions*, *supra* note 2, at 40.

[8] Lending Transparency Rule, 88 Fed. Reg. at 35165.

[9] *Id.*

[10] *Id.*

4.      Fifteen years after Congress enacted Section 1071, however, CFPB has yet to comply with Congress's command. It has never collected the data required by Section 1071, much less made it available to the public. And recently, it has taken actions announcing it would continue to refuse to perform its long-overdue obligations.

5.      Previously, CFPB acknowledged its obligation to collect this data in litigation with Plaintiffs. In 2019, Plaintiffs Rise Economy (then known as California Reinvestment Coalition) and ReShonda Young, together with non-profit organization the National Association for Latino Community Asset Builders ("NALCAB") and another small business owner, sued CFPB and its then-director Kathleen L. Kraninger.[11] While the parties were awaiting decision on Plaintiffs' motion for summary judgment, they agreed to settle the case, with CFPB admitting that "the Bureau is required to issue regulations … to implement Section 1071" but "has not issued the Section 1071 Implementing Regulations."[12]

6.      Pursuant to the 2020 Settlement, CFPB undertook that overdue rulemaking and issued a final rule implementing Section 1071 (the "Lending Transparency Rule").[13] The first compliance deadline was originally set for October 1, 2024, and subsequently extended to July 18, 2025.[14]

7.      On April 30, 2025, however, Defendants announced that they would not comply with Congress's requirements and their own regulation. In a press release announcing this new policy of abdicating their statutory obligations, they assured all regulated entities that they would

---

[11] *Cal. Reinv. Coal. v. Kraninger*, No. 19-cv-2572 (N.D. Cal. filed May 14, 2019).

[12] Stipulated Settlement Agreement 1, *Cal. Reinv. Coal.*, No. 19-cv-2572 (Feb. 26, 2020), ECF No. 52 (the "2020 Settlement").

[13] Lending Transparency Rule, 88 Fed. Reg. 35150.

[14] Small Business Lending Under the Equal Credit Opportunity Act (Regulation B); Extension of Compliance Dates, 89 Fed. Reg. 55024 (July 3, 2024).

not "prioritize enforcement or supervision actions" for any violations of the Lending Transparency Rule.[15]

8.    Then, on June 17, 2025, without an opportunity for public notice and comment, CFPB issued an interim final rule ("2025 IFR") extending the compliance deadlines again—this time, by a full year.[16] Under the 2025 IFR, the earliest that financial institutions must comply with the data collection requirements of Section 1071 is July 1, 2026, almost two years later than the original final rule contemplated.[17]

9.    Recently, on July 8, 2025, CFPB placed the top agency official responsible for overseeing fair lending, Frank Vespa-Papaleo, on administrative leave, further signaling a departure from enforcement of fair lending rules.[18]

10.    The 2025 IFR and CFPB's refusal to implement Section 1071 and the Lending Transparency Rule violate the Administrative Procedure Act and the Equal Credit Opportunity Act. CFPB is unlawfully withholding and unreasonably delaying agency action, amending its duly promulgated regulations without observance of procedure required by law, not acting in accordance with the Equal Credit Opportunity Act, and acting arbitrarily and capriciously.

11.    Defendants' unlawful agency action will harm small businesses and the communities they serve. CFPB long ago concluded that the data required by Section 1071 is critical to identifying "credit deserts" where businesses and communities have difficulty accessing credit,

---

[15] Press Release, CFPB, CFPB Keeps Its Enforcement and Supervision Resources Focused on Pressing Threats to Consumers (Apr. 30, 2025), https://perma.cc/PER8-T4HE.

[16] Small Business Lending Under the Equal Credit Opportunity Act (Regulation B); Extension of Compliance Dates, 90 Fed. Reg. 25874 (June 18, 2025) (to be codified at 12 C.F.R. pt. 1002) ("2025 IFR").

[17] *Id.* at 25875.

[18] Douglas Gillison & Chris Prentice, *Consumer Agency Sidelines Top Fair Lending Official, Sources Say*, Reuters (July 8, 2025), https://perma.cc/9FYC-DJST.

and to allow financial institutions, community development organizations, and governmental agencies to identify areas of need and potential solutions.[19] Without this data, CFPB explained, "it is not possible to confidently answer basic questions regarding the state of small business lending."[20]

12.    The absence of data impedes the ability of small businesses, including farms and businesses owned by women or minorities, to obtain financing, significantly harming their prospects for success. For example, a study found a correlation between small businesses' ability to access credit and their ability to hire, retain, and compensate employees.[21] Without the benefit of Section 1071 data, the barrier to credit access that small businesses face cannot be fully identified or quantified, nor do covered institutions have an incentive to ensure that all communities have equal access to credit.

13.    Defendants' denial of statutorily mandated information has detrimentally affected Plaintiffs Rise Economy, NCRC, and MSA, which seek to support community development efforts, as well as their member organizations. Defendants' denial of information has also harmed Plaintiff ReShonda Young, a small business owner and founder of an Iowa state bank opening later this year.

14.    Accordingly, the Court should declare Defendants in violation of the APA and the Equal Credit Opportunity Act, set aside Defendants' policy of invalidating the Lending Transparency Rule, and require CFPB to begin collecting and publishing the required data.

---

[19] *Key Dimensions*, *supra* note 2, at 40.

[20] *Id.*

[21] Lending Transparency Rule, 88 Fed. Reg. at 35158.

## II.     JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

16.     Venue is proper under 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, Defendants are a United States agency and its officer sued in his official capacity, and at least one Plaintiff and at least one Defendant resides in and has its principal place of business in this district.

## III.     PARTIES

17.     Plaintiff Rise Economy, founded in 1986 as the California Reinvestment Coalition ("CRC"), is a nonprofit organization operating under Section 501(c)(3) of the Internal Revenue Code. Rise Economy is based in San Francisco, California. Rise Economy was founded to aid low-income communities and communities of color in accessing credit, financial services, and investments. Its membership comprises more than 300 nonprofit community-based organizations and public agencies, including small business lenders, community development financial institutions, and technical assistance providers that work directly with small businesses to ensure equal access to capital. Of particular relevance here, Rise Economy seeks to accomplish its mission by negotiating agreements and advocating with lenders to increase lending to and investments in women-owned, minority-owned, and small businesses, and by publishing evidence-based reports and analyses to educate its members, policymakers, and the public about areas of need and ways to promote credit access.

18.     Plaintiff National Community Reinvestment Coalition ("NCRC"), founded in 1990, is a nonprofit organization operating under Section 501(c)(3) of the Internal Revenue Code. NCRC is based in Washington, D.C. NCRC's mission is to help increase the flow of capital into underserved communities. Its membership comprises more than 700 community reinvestment

organizations, community development corporations, local and state government agencies, faith-based institutions, community organizing and civil rights groups, minority- and women-owned business associations, and local and social service providers from across the nation. In particular, NCRC seeks to accomplish its mission by publishing evidence-based reports to educate its members, which inform NCRC's own negotiations with lenders and educate the public and lenders about local needs; negotiating agreements with lenders to increase lending to and investments in low-to-moderate income communities; and participating in public processes to comment on banks' performance.

19.     Plaintiff Main Street Alliance ("MSA") is a national network of small businesses; its members include approximately 30,000 small businesses across the United States. MSA's members also include farms, and MSA works closely with many members who source from local family farmers. MSA helps small business owners realize their full potential as leaders for a just future that prioritizes good jobs, equity, and community through organizing, research, and policy advocacy. MSA also seeks to amplify the voices of its small business membership by sharing their experiences with the aim of creating an economy where all small business owners have an equal opportunity to succeed. MSA's women- and minority-owned businesses have historically been left out of credit markets, in part because the current data on financial institution lending practices is inadequate to fully understand or remedy the extent to which discriminatory lending creates credit deserts for small businesses and businesses owned by women and people of color.

20.     Plaintiff ReShonda Young is an Iowa resident, small business owner, and the founder of a bank expected to open later this year. Ms. Young is also a member of MSA.

21.     Defendant Russell Vought is Acting Director of the Consumer Financial Protection Bureau.

22.    Defendant Consumer Financial Protection Bureau is a federal agency headquartered in Washington, D.C.

### IV.    FACTUAL ALLEGATIONS

**A.    Section 1071 of the Dodd-Frank Act**

23.    For decades, Plaintiffs Rise Economy, NCRC, and MSA and their member organizations have been calling for changes to federal law to require collection and publication of data documenting lending to small businesses, including farms and businesses owned by women or minorities, and lending in neighborhoods of color, in order to identify needs and opportunities for increasing access to capital among those communities.

24.    Although the lack of data makes it difficult to conduct meaningful comparisons between small businesses' access to credit relative to other businesses', the limited data available suggests that small businesses, especially those that are women-owned or minority-owned, face obstacles that their counterparts do not. Despite their positive impact on the economy, "small businesses generally have limited access to capital and other vital resources that help entrepreneurs grow their businesses."[22] The impact of credit deserts is even worse for minority-owned and women-owned small businesses. For example, a recent report issued by CFPB concluded that "[p]eople of color are more likely to be denied credit, compared to similarly situated white borrowers."[23]

25.    The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act" or "Act") enacted a series of reforms designed to prevent a recurrence of the

---

[22] *Key Dimensions*, *supra* note 2, at 18.

[23] Press Release, CFPB, CFPB Releases Reports on Banking Access and Consumer Finance in Southern States (June 21, 2023), https://perma.cc/3RMW-DWR2. *See also* Lending Transparency Rule, 88 Fed. Reg. at 35165.

2008 financial crisis and to protect consumers from harmful and predatory practices by financial institutions.

26.    The Act established CFPB with the purpose of "ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511(a). The Act gave CFPB broad regulatory authority with which to accomplish this mission and established several mandatory duties consistent with its mission.

27.    Among these, in order to address an identified problem with the inability of small, women-owned, and minority-owned businesses to access credit on the same terms and conditions as other loan applicants, Congress established requirements for CFPB to collect and publish data regarding lending to these communities. These requirements are codified in Section 1071 of the Dodd-Frank Act. *See* 15 U.S.C. § 1691c–2.

28.    Section 1071's purpose is "to facilitate enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses." *Id.* § 1691c–2(a).

29.    In furtherance of this purpose, Section 1071 amended the Equal Credit Opportunity Act to provide that "[e]ach financial institution shall compile and maintain, in accordance with regulations of the Bureau," data describing loan applications submitted by women-owned, minority-owned, and small businesses, and the action taken on those applications. *See id.* § 1691c–2(e)(1).

30.    Such data "shall be submitted annually to the Bureau," and "shall be . . . annually made available to the public generally by the Bureau, in such form and in such manner as is

determined by the Bureau, by regulation." *Id.* § 1691c–2(f). CFPB must also make it "available to any member of the public, upon request, in the form required under regulations prescribed by the Bureau." *Id.*

**B.    CFPB's Thirteen Years of Planning and Delaying the Lending Transparency Rule**

31.    CFPB spent years planning, analyzing, and drafting the Lending Transparency Rule. In December 2012, CFPB reported that it had "begun the planning process to promulgate rules" concerning Section 1071, and was "gathering information from stakeholders to better understand the relevant business lending markets, and to determine what data are available and how best to collect those data."[24]

32.    In the spring of 2016, CFPB announced further plans to "focus on outreach and research to develop its understanding of the players, products, and practices in the small business lending market and of the potential ways to implement [S]ection 1071."[25]

33.    By the spring of 2017, these preliminary steps seemed to be bearing fruit. CFPB held a field hearing and roundtable on May 10, 2017, in which Rise Economy, NCRC, and their members participated. One week later, Rise Economy and their members and partners convened a panel of small business owners to discuss with CFPB and other banking regulators the challenges small business owners face in accessing bank credit and being relegated to high-cost merchant cash advance and other online lenders, and the need for small business lending data to address these problems.

---

[24] CFPB, *Fair Lending Report of the Consumer Financial Protection Bureau* 25–26 (2012), https://perma.cc/8L7V-9GEM.

[25] Business Lending Data (Regulation B), Off. of Info. and Regul. Affs. (Spring 2016), https://perma.cc/U6LQ-45Q3.

34.    CFPB solicited comments "to enhance [its] understanding of the small business lending market."[26] Many of the comments were submitted by women-owned, minority-owned, and small businesses, as well as nonprofit organizations focused on ensuring access to capital, who urged CFPB to move expeditiously to implement Section 1071's commands. Plaintiffs Rise Economy and NCRC filed comments urging swift implementation and offering suggestions for the implementing regulations.

35.    Soon after, CFPB issued a May 2017 report summarizing its research on the small business lending landscape. The report recognized that "[s]mall businesses play a key role in fostering community development and fueling economic growth both nationally and in their local communities," with "[w]omen-owned and minority-owned small businesses" playing a particularly important role in supporting local communities.[27] It also concluded that "the ability to access financing plays an important role in allowing small businesses to grow and contribute to the economy."[28] Yet, CFPB acknowledged, "[d]ata on how small businesses engage with credit markets are incomplete," and "without more robust data it will continue to be difficult to assess how well the market is meeting the needs of small businesses."[29]

36.    In 2018, CFPB backtracked, delaying pre-rule activities and moving the rule to the "longer-term action status" for rules on which they did not expect near-term activity.[30]

---

[26] Request for Information Regarding the Small Business Lending Market, 82 Fed. Reg. 22318, 22319 (May 15, 2017) ("RFI").

[27] *Key Dimensions*, supra note 2, at 3.

[28] *Id.* at 17.

[29] *Id.* at 3, 39.

[30] Kelly Cochran, *Fall 2018 Rulemaking Agenda*, CFPB (Oct. 17, 2018), https://perma.cc/T5S3-MHSR.

37.    This led Plaintiffs Rise Economy and Young, together with NALCAB and another small business owner, to file suit in 2019, arguing that CFPB was unlawfully withholding agency action and acting arbitrarily and capriciously, not in accordance with law, and in excess of statutory authority.[31]

38.    After the plaintiffs in that litigation moved for summary judgment, but before the district court ruled on their motion, the parties settled the case. As part of the settlement, CFPB conceded that "the Bureau is required to issue regulations . . . to implement Section 1071, but "ha[d] not issued the Section 1071 Implementing Regulations."[32] To resolve the litigation, CFPB agreed to undertake the statutorily required rulemaking process, observing court-ordered deadlines.[33]

39.    Over the following three years, CFPB took steps toward the fulfillment of its statutory obligations. It released an outline of proposals under consideration and alternatives considered, consistent with the Small Business Regulatory Enforcement Fairness Act, 5 U.S.C. § 609; convened a Small Business Advocacy Review panel; issued a proposed rule; and, on March 3, 2023, issued the final Lending Transparency Rule.[34] Rise Economy, NCRC, and MSA submitted comments on the proposed rule at every opportunity.

## C.    The Lending Transparency Rule

40.    The 422-page Lending Transparency Rule explained that "[a]s envisioned by Congress, the [Lending Transparency Rule] will create our nation's first consistent and comprehensive database regarding lending to small businesses." This would "fulfill section 1071's

---

[31] Compl., *Cal. Reinv. Coal.*, No. 19-cv-2572 (May 14, 2019), ECF No. 1.

[32] 2020 Settlement, *supra note* 11, at 1.

[33] *Id.* ¶¶ 1–11.

[34] *See generally* Status Reports, *Cal. Reinv. Coal.*, No. 19-cv-2572, ECF Nos. 54–72.

statutory purposes by," inter alia, "enabling a range of stakeholders to better identify business and community development needs and opportunities for small businesses, including women-owned and minority-owned small businesses."[35]

41.    CFPB observed that "[i]n line with congressional purpose, information collected about these businesses may provide opportunities for community development lending, and the information collected may be particularly important to support fair lending analysis."[36] It concluded that "small business lending data are essential to better understand the small business financing landscape to maintain and expand support for this key part of the U.S. economy."[37] It summarized its expectations of the Lending Transparency Rule's benefits:

> The Bureau believes, based on its consideration of … Federal statutes and regulations, that its rule implementing section 1071 will provide more data to the public—including communities, governmental entities, and creditors—for analyzing whether financial institutions are serving the credit needs of their small business customers. In addition, with data provided under this rule, the public will be better able to understand access to and sources of credit in particular communities or industries, such as a higher concentration of risky loan products in a given community, and to identify the emergence of new loan products, participants, or underwriting practices. The data will not only assist in identifying potentially discriminatory practices, but will contribute to a better understanding of the experiences that members within certain communities may share in the small business financing market.
>
> Increased transparency about application and lending practices across different communities will improve credit outcomes, and thus community and business development. Lenders will be able to better understand small business lending market conditions and determine how best to provide credit to borrowers, where currently they cannot conduct very granular or comprehensive analyses because the data on small business lending are limited. As reduced uncertainty helps lenders to identify potentially profitable opportunities to extend responsible and affordable credit, small businesses stand to benefit from increased credit availability. Transparency will also allow small business owners to more easily compare credit terms and evaluate credit alternatives; without these data, small business owners are

---

[35] 88 Fed. Reg. at 35150.

[36] *Id.* at 35165.

[37] *Id.* at 35166.

limited in their ability to shop for the credit product that best suits their needs at the best price.[38]

42.    Accordingly, CFPB promulgated the Lending Transparency Rule, codified at 12 C.F.R. §§ 1002.101–1002.114. Among other things, the Lending Transparency Rule explained what financial institutions and transactions were covered, *id.* §§ 1002.103–1002.106; what data must be compiled and reported, *id.* §§ 1002.107, 1002.109; how that data should be walled off from lending determinations, *id.* § 1002.108; and how CFPB and financial institutions would make that data available to the public, *id.* § 1002.110.

43.    The Lending Transparency Rule stated that it would "become effective 90 days after publication in the Federal Register," *i.e.*, August 29, 2023. It provided staggered compliance deadlines based on institution size, with the largest institutions required to comply by October 1, 2024, and the smallest by January 1, 2026.[39]

**D.    Challenges to the Lending Transparency Rule**

44.    Representatives of the banking industry challenged the Lending Transparency Rule in the Southern District of Texas in a case called *Texas Bankers Association v. CFPB*.[40] On July 31, 2023, the district court preliminarily enjoined CFPB from implementing and enforcing the Lending Transparency Rule, on the basis of separate litigation that resulted in a Fifth Circuit opinion holding CFPB's funding structure unconstitutional.[41] The district court subsequently extended this stay to cover all covered financial institutions.[42]

---

[38] *Id.* at 35168.

[39] *Id.* at 35152.

[40] *Tex. Bankers Ass'n v. CFPB*, 685 F. Supp. 3d 445 (S.D. Tex. 2023).

[41] *See Tex. Bankers Ass'n*, 685 F. Supp. 3d at 458 (citing *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 623 (5th Cir. 2022)).

[42] *See Tex. Bankers Ass'n v. CFPB*, No. 23-cv-144, 2023 WL 8480105, at *2 (S.D. Tex. Oct. 26, 2023).

45.     The Supreme Court reversed the Fifth Circuit's funding structure decision on May 16, 2024,[43] leading the *Texas Bankers Association* court to lift the stay on the Lending Transparency Rule. On July 3, 2024, CFPB issued an interim final rule (the "2024 IFR") extending the Lending Transparency Rule's compliance dates by 290 days to compensate for the period during which the rule was stayed.[44] The compliance dates at that time were July 18, 2025, January 16, 2026, and October 18, 2026, for highest, moderate, and smallest volume lenders, respectively.

46.     On August 26, 2024, the *Texas Bankers Association* district court granted summary judgment to CFPB, rejecting the banking plaintiffs' arguments that the Lending Transparency Rule was arbitrary and capricious or otherwise in violation of the APA and the Equal Credit Opportunity Act.[45] The court found that the Lending Transparency Rule's "voluminous" administrative record showed that "the agency has reasonably assessed the effects of the Final [Lending Transparency] Rule, including its anticipated costs versus benefits,"[46] and that there was "no textual basis" for the argument that the Lending Transparency Rule exceeded or contradicted Section 1071.[47]

47.     The district court then denied the banking plaintiffs' motion to stay the Lending Transparency Rule's deadlines (as amended by the 2024 IFR) pending appeal.[48] The plaintiffs similarly asked the Fifth Circuit to stay the deadlines pending appeal, which it declined to do.[49]

---

[43] *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024).

[44] 89 Fed. Reg. at 55024.

[45] *Tex. Bankers Ass'n*, No. 23-cv-144, 2024 WL 3939598 (Aug. 26, 2024).

[46] *Id.* at *14.

[47] *Id.* at *8.

[48] *Tex. Bankers Ass'n*, No. 23-cv-144, 2024 WL 5256501 (Nov. 14, 2024).

[49] Order Den. Temporary Administrative Stay, *Tex. Bankers Ass'n v. CFPB*, No. 24-40705 (5th Cir. Oct. 31, 2024), ECF No. 38.

48.     Other banking groups filed suit to challenge the Lending Transparency Rule in district courts in Florida and Kentucky.[50] In Florida, a magistrate judge recommended that the district court grant summary judgment to CFPB, similarly finding that the Lending Transparency Rule was within CFPB's statutory authority and not arbitrary or capricious.[51] In Kentucky, the plaintiffs voluntarily dismissed most of their claims in light of the *Texas Bankers Association* ruling, then filed an amended complaint on January 28, 2025.[52]

49.     Thus, to date, no court has held or suggested that any plaintiffs have a likelihood of success on any of their claims against the Lending Transparency Rule (other than the funding structure argument subsequently reversed by the Supreme Court). To the contrary, two judges have considered the claims and found them meritless.

**E.     Defendants' Efforts to Prevent the Lending Transparency Rule from Taking Effect**

50.     On February 1, 2025, President Trump fired CFPB's then-Director, Rohit Chopra. On February 3, 2025, President Trump named Secretary of the Treasury Scott Bessent as Acting Director.

51.     Within hours of his temporary appointment, Bessent ordered CFPB staff to halt virtually all of the Bureau's work, including all enforcement, litigation, rulemaking, and

---

[50] *Revenue Based Fin. Coal. v. CFPB*, No. 23-cv-24882 (S.D. Fla. filed Dec. 26, 2023); *Monticello Banking Co. v. CFPB*, No. 23-cv-148 (E.D. Ky. filed Aug. 11, 2023).

[51] R. & R. on Cross Mots. for Summ. J., *Revenue Based Fin. Coal.*, No. 23-cv-24882 (S.D. Fla. Feb. 17, 2025), ECF No. 68.

[52] Mot. for Voluntary Dismissal, *Monticello Banking*, No. 23-cv-148 (E.D. Ky. Aug. 30, 2024), ECF No. 34; Am. Compl., *Monticello Banking*, No. 23-cv-148 (E.D. Ky. Jan. 28, 2025), ECF No. 42.

communications. He prohibited CFPB's attorneys from doing anything in ongoing litigation other than seeking continuances.[53]

52.     On February 6, 2025, Defendant Vought was confirmed as Director of the Office of Management and Budget. The following day, Friday, February 7, he informed staff that he was now Acting Director of CFPB.

53.     Defendant Vought had led the creation of a "180-Day Transition Playbook" for Project 2025 that, on information and belief, laid out plans to abolish CFPB. Presidential advisor Elon Musk responded to Vought's appointment as Acting Director with a tweet that simply read "CFPB RIP" with a tombstone emoji.[54]

54.     Immediately upon appointment, Defendant Vought began implementing those plans. Over the course of Saturday, February 8, and Sunday, February 9, he suspended all CFPB activities, ordered all staff to "stand down from performing any work task," closed CFPB's headquarters, and announced an intention to zero out CFPB's budget. He fired all probationary and term-limited employees without cause and implemented a reduction-in-force that would terminate the rest of the staff by February 14.[55]

55.     President Trump responded to these efforts by describing CFPB as "a very important thing to get rid of."[56]

56.     Judge Amy Berman Jackson of the District Court for the District of Columbia enjoined many of these actions, finding that they constitute "a hurried effort to dismantle and

---

[53] *Nat'l Treasury Emps. Union v. Vought*, 774 F. Supp. 3d 1, 16 (D.D.C. 2025) (citing February 3, 2025 email from Bessent); Evan Weinberger, *Bessent Freezes Most CFPB Work Upon Taking Control of Agency*, Bloomberg L. (Feb. 3, 2025), https://perma.cc/V2LY-3GPU.

[54] Elon Musk (@ElonMusk), X (Feb. 7, 2025, 4:41 PM), https://perma.cc/H56E-X89L.

[55] *Nat'l Treasury Emps. Union*, 774 F. Supp. 3d at 44–46.

[56] *Id.* at 11.

disable the agency entirely."[57] The D.C. Circuit declined to stay substantial portions of the injunction.[58]

57.      With their efforts to dismantle CFPB in its entirety stymied, Defendants turned to other means of obstructing its statutorily required work. They could not lawfully stay the compliance dates for the Lending Transparency Rule without going through notice-and-comment rulemaking. But the three legal challenges to the Lending Transparency Rule—none of which had been successful, and two of which had already produced opinions upholding the Lending Transparency Rule in its entirety—gave them a pretext for circumventing their obligations under the Administrative Procedure Act.

58.      Their first opportunity arose in the Fifth Circuit appeal of *Texas Bankers Association*. Oral argument was scheduled for February 3, the day Bessent was named Acting Director. Counsel for CFPB appeared for the argument but informed the Fifth Circuit that, at Bessent's direction, counsel would not argue the case.[59] Then, even though CFPB had previously opposed the plaintiffs' motion to stay the Lending Transparency Rule pending appeal and the Fifth Circuit had declined to grant a stay,[60] CFPB "supplemented" its response to the motion to stay to inform the court that it no longer opposed the motion to "stay obligations to comply with the rule, and toll compliance deadlines, for 90 days to give the Acting Director time to consider the

---

[57] *Id.*

[58] Per Curiam Order, *Nat'l Treasury Emps. Union v. Vought*, No. 25-5091 (D.C. Cir. Apr. 28, 2025); Per Curiam Order, *Nat'l Treasury Emps. Union*, No. 25-5091 (Apr. 11, 2025).

[59] *See Tex. Bankers Ass'n v. CFPB*, No. 24-40705, 2025 WL 429913, at *1 (5th Cir. Feb. 7, 2025).

[60] Order Den. Temporary Administrative Stay, *Tex. Bankers Ass'n*, No. 24-40705 (Oct. 31, 2024), ECF No. 38 (denying motion for an administrative stay and declining to decide motion for stay pending appeal).

issues."[61] In light of CFPB's change in position, the Fifth Circuit granted the stay, tolling deadlines for compliance with the Lending Transparency Rule "but only for plaintiffs and intervenors in" *Texas Bankers Association*.[62]

59.    The plaintiff in the Florida case followed suit, filing its own motion to stay the Lending Transparency Rule, which CFPB urged the court to grant.[63] On May 6, 2025, the court granted the motion and stayed the Lending Transparency Rule as to the plaintiff.[64] CFPB moved to stay the Lending Transparency Rule in the Kentucky case, stating that the Bureau intends "to extend the rule's deadlines for all regulated entities . . . likely by one year."[65] The court stayed the action until the court resolves the motion to stay.[66] Following the Fifth Circuit's lead, the district courts in Florida and Kentucky issued stays only as to the plaintiffs in their respective cases.[67]

60.    Thus, Defendants achieved through acquiescence in court litigation what they could not through direct agency action: a stay of the Lending Transparency Rule. But these stays were limited to the parties in those cases, and thus were not enough to satisfy Defendants' desire to prevent CFPB from fulfilling its statutory obligations.

---

[61] Suppl. Resp. to Mot. to Stay 2, *Tex. Bankers Ass'n*, No. 24-40705 (Feb. 5, 2025), ECF No. 129.

[62] *Tex. Bankers Ass'n*, 2025 WL 429913, at *1. Plaintiff Rise Economy moved to intervene in the *Texas Bankers Association* appeal to oppose this outcome, but the Court denied Rise Economy's motion. *Tex. Bankers Ass'n*, No. 24-40705 (5th Cir.), ECF Nos. 82, 91, 99, 115, 120, 127.

[63] Defs.' Resp. to Pl.'s Mot. to Stay Section 1071 Rule & Hold Proceedings in Abeyance, *Revenue Based Fin. Coal.*, No. 23-cv-24882 (S.D. Fla. Apr. 3, 2025), ECF No. 75.

[64] *Revenue Based Fin. Coal. v. CFPB*, No. 23-cv-24882, 2025 WL 1311264, at *1 (S.D. Fla. May 6, 2025).

[65] Defs.' Mot. to Stay 2, *Monticello Banking*, No. 23-cv-148 (E.D. Ky. May 28, 2025), ECF No. 49.

[66] Op. & Order, *Monticello Banking*, No. 23-cv-148 (E.D. Ky. May 29, 2025), ECF No. 50.

[67] *Id.*; *Revenue Based Fin. Coal.*, 2025 WL 1311264, at *1.

61.     To further its unlawful goal, Defendants issued a press release on April 30, 2025, announcing that it would "not prioritize enforcement or supervision actions with regard to entities that are currently outside the stay imposed under" *Texas Bankers Association*.[68] Defendants cited "resource constraints" as well as "the unfairness of enforcing [the Lending Transparency Rule] against entities not protected by the court's stay."[69]

62.     In other words, CFPB asked a court to stay the Lending Transparency Rule for some entities and then used the stay it obtained to justify a blanket policy of non-enforcement of the Rule, all without following the procedures required by the Administrative Procedure Act.

63.     The lending industry immediately recognized this new policy as a complete abandonment of Section 1071 and the Lending Transparency Rule. The Financial Services Observer reported that "CFPB will not enforce small business lending rule,"[70] while America's Credit Unions referred to it as a "sweet escape" from Section 1071.[71]

64.     Moreover, the reasons given for the blanket non-enforcement policy were manifestly pretextual. Defendants cited "resource constraints," but they were in the middle of a campaign to massively reduce CFPB's resources.[72] If they were actually concerned that CFPB lacked sufficient resources to enforce its lawfully promulgated Lending Transparency Rule, they

---

[68] Press Release, CFPB, CFPB Keeps Its Enforcement and Supervision Resources Focused on Pressing Threats to Consumers, *supra* note 14.

[69] *Id.*

[70] Timothy A. Butler et al., *CFPB Will Not Enforce Small Business Lending Rule*, Greenberg Traurig Fin. Servs. Observer (May 6, 2025) (capitalization altered), https://perma.cc/C85B-8KE7.

[71] JaMonika Williams, *The Sweet Escape: CFPB Won't Prioritize Enforcement of Section 1071*, Am.'s Credit Unions (capitalization altered), https://perma.cc/YV42-8HB2.

[72] *Nat'l Treasury Emps. Union*, 774 F. Supp. 3d at 60.

could have avoided that concern by not attempting to zero out its budget and eliminate its workforce.

65.     Similarly, the supposed concern for fairness to "entities not protected by the court's stay" rang hollow, given that Defendants supported the stay in *Texas Bankers Association* in the first place.

66.     Defendants cemented their non-enforcement of Section 1071 through an interim final rule issued on June 17, 2025 ("2025 IFR"). Interim final rules, unlike final rules, do not undergo notice and comment, but the agency that issues the interim final rule must have "good cause" for deviating from notice and comment.[73] Without the benefit of input from small businesses affected by delayed implementation of Section 1071 or anyone else, CFPB extended the compliance deadlines by a full year in the 2025 IFR.[74] Under the 2025 IFR, the earliest that banks must comply with the data collection requirements of Section 1071 is July 1, 2026, almost two years later than the original final rule required.[75]

67.     As with the blanket non-enforcement policy that CFPB announced in April 2025, the 2025 IFR states that CFPB's sole "good cause" reason for extending the compliance deadlines was because of court orders from three different courts staying the rule's compliance for some participants.[76] But it does not disclose the fact that it was CFPB that either supported or requested those stays.[77] CFPB thus sought to extend compliance deadlines "[t]o facilitate consistent

---

[73] 5 U.S.C. § 553(b)(B).

[74] 2025 IFR, 90 Fed. Reg. at 25874.

[75] *Id.* at 25875.

[76] *Id.*

[77] Defs.' Mot. to Stay 2, *Monticello Banking*, No. 23-cv-148 (May 28, 2025), ECF No. 49; *Tex. Bankers Ass'n*, 2025 WL 429913, at *1; *Revenue Based Fin. Coal.*, 2025 WL 1311264, at *1.

compliance across all covered financial institutions," even though the patchwork of financial institutions' obligations was of CFPB's own making.

68.     CFPB's 2025 IFR recognized that small businesses would be negatively impacted by its further delay in requiring compliance with Section 1071. Indeed, as CFPB itself stated: "In an environment with limited data sources on small business credit, the CFPB expects data collected under the rule to enable communities, governmental entities, and creditors to identify business and community development needs and opportunities for women-owned, minority-owned, and small businesses. . . . [T]he extension of the compliance dates reduces the benefits accruing to small businesses by delaying the realization of these benefits."[78] As a result, "small businesses' and financial institutions' realizations of the benefits arising from the 2023 final rule will likewise be delayed by at least one year, reducing the real net present value of these expected future benefits."[79] CFPB did not quantify the costs associated with this delay.[80]

69.     CFPB further made clear in the 2025 IFR that it plans "to issue a new proposal to reconsider certain aspects of the 2023 final rule," leaving open the possibility that CFPB may seek to prevent financial institutions from ever having to comply with Section 1071.[81]

70.     Recently, on July 8, CFPB placed Frank Vespa-Papaleo, assistant director for fair lending and equal opportunity and the official responsible for overseeing fair lending at CFPB, on administrative leave.[82]

---

[78] 2025 IFR, 90 Fed. Reg. at 25879.

[79] *Id.*

[80] *Id.*

[81] *Id.* at 25875.

[82] Douglas Gillison & Chris Prentice, *supra* note 17.

## V.    HARM TO PLAINTIFFS

### a.    Harm to Rise Economy

71.    CFPB's nearly decade-long failure has harmed and continues to harm Rise Economy, as well as its members and the small businesses and communities that it serves. It inhibits Rise Economy's ability to carry out its mission critical activities, including developing and issuing reports about access to credit; advising economic development organizations working with women-owned, minority-owned, and small businesses on getting loans; and working with lenders to encourage greater investment in low-income communities and communities of color.

72.    For example, Rise Economy regularly conducts analyses of access to credit for women-owned, minority-owned, and small businesses. Its previous reports have been based on data collected from the Federal Financial Institutions Examinations Council ("FFIEC"), the Small Business Administration, and similar sources. But as CFPB has recognized, the FFIEC's datasets "are limited in their ability to appropriately convey the full extent of lending to small businesses."[83] As a result, "with current data it is not possible to confidently answer basic questions regarding the state of small business lending."[84]

73.    This is the exact reason Congress enacted Section 1071: to "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses." 15 U.S.C. § 1691c–2(a). With the data mandated by Section 1071, Rise Economy would produce targeted, data-driven analyses and reports about the credit needs of communities and, in particular, women-owned, minority-owned, and small businesses. CFPB's failure renders this impossible, limiting Rise

---

[83] *Key Dimensions*, *supra* note 2, at 28.

[84] *Id.* at 40.

Economy's ability to produce informed analyses and increasing the costs of obtaining necessary information.

74.    Rise Economy also devotes substantial resources to negotiating agreements with lenders and encouraging them to support the credit needs of women-owned, minority-owned, and small businesses. Through these Community Benefits Agreements, Rise Economy obtains commitments to provide loans, investments, and financial services in communities that have historically faced barriers to accessing credit. CFPB's failure impairs these efforts by making it far harder for Rise Economy to identify the communities most in need and the services that could be most beneficial. This increases the difficulty and resource-intensiveness of each effort Rise Economy undertakes, reducing the number of agreements Rise Economy can pursue; restricting Rise Economy's ability to address unequal credit access issues in such agreements; and preventing Rise Economy from being able to address these issues adequately in meetings with financial institutions with whom they do not have formal agreements.

75.    CFPB's failure to implement Section 1071 has also impaired the ability of Rise Economy and its members to work with state and local governments to enact policies to improve lending practices. The failure has deprived Rise Economy and its members of data they would use in developing and advocating for effective state and local legislative and regulatory measures on multiple fronts, such as regulation of merchant cash advance lenders and high-cost online lenders. For the past few years, Rise Economy has prioritized efforts to create a state Community Reinvestment Act through the California legislature, a policy highlighted by CFPB in one of its reports.[85] The state's ability to effectively determine whether various types of financial institutions

---

[85] CFPB, *State Community Reinvestment Acts: Summary of State Laws* (2023), https://perma.cc/6LC2-Z7NF.

are meeting the credit needs of all small businesses in all California communities hinges on the finalization and implementation of the Lending Transparency Rule.

76.    CFPB's failure to implement Section 1071 has similarly adversely affected the ability of Rise Economy and its members to work with CFPB and other bank regulators to ensure appropriate enforcement of federal fair lending laws and implementation of the Community Reinvestment Act. Without Section 1071 data, Rise Economy and its members are unable to raise discrimination concerns and claims related to business lending practices with lenders and regulators. In a different context, Rise Economy is able to raise mortgage lending discrimination concerns and violations with lenders and regulators because lenders are already required to collect and report substantially similar data concerning home mortgage applications pursuant to the Home Mortgage Disclosure Act (HMDA). Rise Economy would use Section 1071 data similarly, but it cannot do so without the data. Defendants' failure to enforce Section 1071 has left Rise Economy without the information it needs to protect small businesses owners and communities from lending gaps and discrimination.

77.    CFPB's failure to implement Section 1071 also has also frustrated Rise Economy's ability to effectively monitor Special Purpose Credit Programs, which are authorized by the Equal Credit Opportunity Act, and which Rise Economy has prioritized in Community Benefits Agreements negotiations and conversations with California banks.

78.    The absence of data transparency also disincentivizes lenders from improving their lending practices. This, in turn, harms not only the affected businesses, but also the communities in which they operate or would operate, as without capital access businesses are unable to hire local workers and serve their communities.

79.     For these reasons, Rise Economy and its members have for decades called for implementation of a data collection requirement for lending to the affected communities, a call that Congress heeded in enacting Section 1071. Since its enactment, Rise Economy and its members have called on CFPB repeatedly to fulfill its statutory duty to implement Section 1071. A 2017 survey of Rise Economy's members who work with small businesses on lending found that 95 percent believed that implementing Section 1071 was critical to ensuring equal access to capital.[86] These calls have been consistently ignored.

80.     In addition, Rise Economy's members—which include small business lenders, community development financial institutions, technical assistance providers, and other organizations that work directly to ensure equal access to capital—are directly harmed by Defendants' failure to implement Section 1071. For example, one Rise Economy member investing in commercial development projects for small businesses in Los Angeles has a critical need for Section 1071 data to identify lending patterns and document where lending is actually occurring. That member anticipated the data would (1) protect small businesses by uncovering potential discrimination against minority-owned and women-owned businesses; (2) encourage lenders to broaden their lending practices, potentially increasing deployment of capital for underserved small businesses; (3) allow small business borrowers to make more informed decisions when seeking financing so as to avoid predatory lenders that ultimately may require community development financial institutions and other community lenders to devote limited resources to bail out victimized small businesses; and (4) contribute to overall economic growth, wealth creation, job creation, and an environment in which clients can thrive. Defendants' actions

---

[86] Kevin Stein & Gina Charusombat, *Displacement, Discrimination, and Determination: Small Business Owners Struggle to Access Affordable Credit*, Cal. Reinvestment Coal. 3 (2017), https://perma.cc/XZ8J-9X5J.

will negatively impact the financial health of small businesses, and, as a result, this Rise Economy member's commercial development projects for small businesses will also suffer.

81.    Another Rise Economy member assisting small, women-owned and minority-owned businesses in distressed neighborhoods in the San Francisco Bay Area and in Fresno also has been harmed by Defendants' failure to implement the Lending Transparency Rule. This member assists small business owners through lending, technical assistance, and other connections to capital. In connection with this work, this member would benefit from full implementation of the Lending Transparency Rule because Section 1071 data would allow it to advocate to lenders about responding to gaps in access to capital. Currently, it lacks the meaningful data to do so. This member also would have utilized the Section 1071 data to identify, and advocate on behalf of, groups that have been particularly underserved and should stand to benefit from Special Purpose Credit Programs, programs authorized by the Equal Credit Opportunity Act to help for-profit creditors serve the unmet credit needs of economically disadvantaged groups. But Defendants' actions have kept this member from the data that would confirm which groups are underserved.

82.    Other Rise Economy members are similarly hindered in their abilities to pursue their missions to provide and secure loans for members of the impacted communities, because without the data mandated by Section 1071, they must expend additional organizational resources—and in some respects are entirely unable—to identify particular needs and opportunities. Thus, without implementation of Section 1071, Rise Economy's members are prevented from effectuating their missions and from focusing their efforts on the individuals and communities with the greatest need for their services.

### b.    Harm to NCRC

83.    CFPB's failure to enforce Section 1071 has caused harm to NCRC for several years, and its delay will prolong that harm. NCRC provides comprehensive research reports that analyze

lending patterns of financial institutions across the country. These reports are critical in advancing NCRC's various programs including policy advocacy, small business lending testing, and negotiating Community Benefits Agreements with financial institutions to create wealth opportunities in underserved communities. CFPB's rollback and failure to fully implement Section 1071 of the Dodd-Frank Act has directly harmed NCRC's ability to advance its programs through these research reports and diminishes NCRC's ability to inform its members' local strategies that address barriers to capital access. It materially impairs NCRC's ability to conduct rigorous research, advocate for civil rights laws, and provide data-driven support to member organizations working on the front lines of economic equity. CFPB's failure to enforce Section 1071 data collection and reporting thus directly hinders NCRC's ability to evaluate and report on access to small business credit in localities across the country—work that is critical to NCRC's mission. CFPB's failure to enforce Section 1071 has caused NCRC to divert resources to fill the information gap.

84.    NCRC's members are also harmed by CFPB's failure to enforce Section 1071 and by NCRC's inability to use Section 1071 data, because NCRC is unable to provide them with evidence-based lending reports to support them in achieving their missions supporting community-based economic development. NCRC's community organization members cannot effectively partner with financial institutions without a shared understanding of local needs—information these members would have had through NCRC had Defendants enforced Section 1071. NCRC's members have missed opportunities to align lending strategies with financial institutions.

85.    NCRC analyzes data regarding access to various types of loans, including mortgages and small business loans. Thanks to the HMDA data that lenders are required to collect and report on home mortgage applications, NCRC evaluates, analyzes, and reports on this data,

identifying trends and disparities in access to home mortgages based on race and ethnicity.[87] NCRC's members use and rely on its reports for their own work. The comprehensiveness of HMDA data is quite powerful. For example, it permits NCRC to compare access to home mortgages within a neighborhood with that of the surrounding city. With the data, NCRC can produce an overview of mortgage lenders within a certain city or county. When NCRC or any of its members undertakes to design and implement a program for low-income buyers within a certain city or county, they rely heavily on HMDA data to do so.

86.    NCRC also analyzes and reports on data regarding access to small business loans in order to pursue its mission to inform its members' local strategies that address barriers to capital access. However, NCRC is unable to produce reports and support its members who require information regarding access to small business loans to the extent NCRC does for home mortgages. This is because NCRC lacks the ability to comprehensively analyze and report on this data due to its unavailability. NCRC currently uses data published pursuant to the Community Reinvestment Act ("CRA"), but this data set has significant limitations. For example, the data is collected only from certain banks, which NCRC estimates account for approximately twenty percent of overall lending to small businesses. Nor does the CRA data specify which banks are lending to which businesses. CRA data is also produced in a difficult-to-use format. Thus, NCRC is unable to access data to establish a baseline that measures bank performance. As a result, NCRC lacks the data to demonstrate the need for a financial institution to enter into a Community Benefits Agreement and is unable to articulate where precisely financial institutions should commit their financial resources for maximum impact and return.

---

[87] See, for example, NCRC's 2025 mortgage market report series. *2025 NCRC Mortgage Market Report Series*, Nat'l Cmty. Reinvestment Coal., https://perma.cc/32TA-5YNU (last visited July 21, 2025).

87.    Without the Section 1071 data, NCRC also is unable to identify discriminatory lending patterns affecting women-owned and minority-owned small businesses and provide evidence-based support to challenge discriminatory small business lending practices, because the missing data is needed for longitudinal studies. This work is a long-standing program for NCRC, as evidenced by its small business lending reports.[88] Moreover, NCRC cannot provide data-driven recommendations to policymakers on small business lending reform which directly frustrates its mission and the legislative intent of Section 1071.

88.    Because Section 1071 data is so crucial to NCRC's work, it has, consistently and over the course of several years, called for CFPB to enforce the statute and begin collecting the data, including by submitting comments to the proposed rule. CFPB's continued refusal to do so has harmed and continues to harm NCRC and its members.

89.    Given's NCRC programmatic work of analyzing HMDA data from financial institutions and given its advocacy work around Section 1071, NCRC is aware that Section 1071 was modeled after HMDA, and the small business lending data that Section 1071 requires would be analogous to HMDA data. And, as NCRC also is aware, the automated compliance software that financial institutions use makes data collection straightforward, and technology exists to seamlessly integrate data collection into existing loan origination processes. As a result, the lack of Section 1071 data is due to Defendants' regulatory delays, not any technological limitations of financial institutions to collect the data.

90.    NCRC's lack of access to Section 1071 data has forced it to divert countless staff hours and resources attempting to make do without it. For example, NCRC staff have devoted

---

[88] Amber Lee et al., *Disinvestment, Discouragement and Inequity In Small Business Lending*, Nat'l Cmty. Reinvestment Coal. (2019), https://perma.cc/YC9X-GADW.

countless hours attempting to interpret and extrapolate CRA data to the broader small business lending market. When members ask NCRC for information regarding small business lending in specific cities or counties, NCRC must expend additional resources attempting to identify and extrapolate the data necessary to respond, and NCRC often is able to give only a partial response to the members' questions.

### c.    Harm to MSA

91.    MSA is harmed by Defendants' lack of enforcement of Section 1071 in a number of ways. First, MSA's membership is largely women-owned businesses, with a larger percentage being minority businesses than the national average. As a result, continued discriminatory practices as a result of missing Section 1071 data diminish the political and economic power of the MSA, and also reduce potential membership revenue from those businesses. Second, without access to the Section 1071 data, it is more difficult for MSA to identify trends across commercial lending to inform policy recommendations to political leaders, one of the organization's core functions.

92.    Many of MSA's members also have been harmed by CFPB's non-enforcement of Section 1071. For example, one of MSA's members, who owns a cleaning business in Minnesota, has struggled to access "capital access programs" designed for minority business owners through traditional commercial lending avenues. This member would have benefited from transparent data about lending practices, so that she could identify potential lending partners using that data. Another member of MSA is the founder and owner of a plant nursery in Saint Paul, Minnesota. This member's inability to obtain commercial lending for her business resulted in her accruing revolving loan debt via credit cards—the only type of credit she was able to obtain. This member, too, would have benefited from transparent Section 1071 data to identify lending partners, and the information could have kept her from accruing credit card debt.

93.    As another example, MSA represents hundreds of small business owners in Madison, Wisconsin, who continue to struggle to access capital for their growing businesses; the majority of these small business owners are women. And while there are 10,000 small businesses with more than one staff member in Madison, only 40 are Black-owned. Madison is thus a prime example of credit deserts, where there continues to be challenges in lending to women-owned, minority-owned, and small business owners. The Section 1071 data would have helped address these challenges, giving MSA the necessary data to advocate on behalf of its members there. Instead, because CFPB will not enforce the Lending Transparency Rule, MSA is unable to make data-backed policy recommendations and MSA's members will be harmed.

94.    From 2021 to 2022, MSA staff interviewed small business owners in Newark, New Jersey and Norfolk, Virginia, where MSA represents 614 small business owners, on the topic of accessing capital. Historically, MSA's members in these locations have experienced discrimination in lending. Through MSA's research, it became clear that financial reforms are needed to address systemic racial and gender discrimination within traditional business lending and to improve capital access. As that research concluded, "[c]apital is not equally distributed among entrepreneurs … Black and Latinx entrepreneurs, in particular, have less business equity on average than their white counterparts and experience discrimination in lending."[89] Transparent data about lenders' practices would have allowed MSA to advocate on behalf of its members with both banking regulators and political leaders in the state legislature to design regulations that will reduce rates of discrimination.

---

[89] Main Street Alliance, *Getting Up to Speed: Access to Capital*, at 3 (2022), https://perma.cc/9K88-QDC3 (citations omitted).

####    d.    Harm to Ms. Young

95.    Ms. Young is a Black female small business owner and a lifelong resident of Waterloo, Iowa.

96.    Black residents of Waterloo have historically suffered substantial levels of discrimination, the effects of which are still felt today through significant social and economic disparities.

97.    A study published by USA Today in 2018 concluded that Waterloo is the single worst city for Black Americans in the country among cities with Black populations of five percent or more, based largely on findings of vastly unequal economic opportunities. The study cited a large disparity in Black versus white unemployment rates (23.9 percent versus 4.4 percent) and in Black residents' income as a percentage of white residents' (46.8 percent).[90] Recent studies confirm that Waterloo is still as harmfully disparate for Black Americans as it was in 2018.[91]

98.    Ms. Young has had to overcome significant obstacles to become a successful small business owner. She has been significantly harmed by business lending discrimination, which Section 1071 was enacted to address.

99.    Ms. Young comes from an entrepreneurial family, and has seen firsthand the effects of business lending discrimination for decades. Her father, who is also Black, ran a successful transportation and maintenance contracting company. Despite his financial success, Ms. Young observed that her father always struggled to obtain capital. The first van he secured for his company had to be purchased by an employee of his, a white woman, because he could not locate

---

[90] Samuel Stebbins & Evan Comen, *These Are the 15 Worst Cities for Black Americans*, 24/7 Wall Street, USA Today, https://perma.cc/P9BT-RNCR (last updated Feb. 27, 2019).

[91] Grant Suneson, *The Worst Cities for Black Americans*, 24/7 Wall St. (June 14, 2023), https://perma.cc/M8T3-NA35.

a bank willing to offer a small business loan to a Black person. Even later, once the business was earning revenue in the millions of dollars and its success was undeniable, Ms. Young's father had to secure loans with his personal residence and other non-business property.

100.    Ms. Young has experienced similar problems in her own time as an entrepreneur. From 2013 until 2019, Ms. Young was the sole owner of Popcorn Heaven, a gourmet popcorn retail franchise. She also owned Popcorn Heaven's flagship location in Waterloo until 2017.

101.    At multiple points during Ms. Young's time launching and operating Popcorn Heaven, she experienced difficulties obtaining a loan as a Black, female, small business owner. Multiple local and regional banks denied her loan applications at Popcorn Heaven's founding, and she ultimately had to accept a loan that provided only two-thirds of the funds she needed to have adequate working capital to operate the business. As a result, although the first Popcorn Heaven store had sizable and stable sales, it was difficult for Ms. Young to stay far enough ahead to be able to grow the business. This led to her selling the Waterloo store in 2017. Despite having less business expertise, the buyer—who was white—was quickly able to obtain a loan twice as large as anything Ms. Young had ever been offered using the same business plan.

102.    Similarly, in June 2025, Ms. Young closed on a deal to acquire a health store. Her partners in the venture include a Black doctor; together, they have a combined net worth in the millions. Nonetheless, they were unable to obtain a $100,000 bank loan, even after offering to put 50% down or provide their houses as collateral. In the end, they were able to close only through a non-traditional and more expensive seller-financed deal, where the sellers hold the loan and the business owners pay the sellers.

103.    Based on her experiences as a business owner, Ms. Young was motivated to launch a bank serving the people of Iowa, the Bank of Jabez. She has hired key executives and brought

on a Board of Directors, and will be filing for approval with the Federal Deposit Insurance Corporation and the Iowa Division of Banking next month. She expects to open the Bank of Jabez by the end of the year. She and her partners plan to focus on serving clients in underbanked communities, and to provide educational services to help people who do not currently qualify for a loan develop the knowledge and resources that they need to qualify.

104.    The Section 1071 data that Congress mandated that CFPB collect and provide would be of tremendous use to Ms. Young, both as a business owner and a banker.

105.    As a business owner, Ms. Young would be able to review banks' lending track records, identifying banks that are more or less likely to discriminate against small, Black-owned, and woman-owned businesses. This would help her find financial services institutions that were more likely to lend to her on reasonable terms, and avoid wasting her time working with banks that have a history of excluding Black and female business owners or providing them less favorable terms.

106.    As a banker, Ms. Young has even more use for the data. Section 1071 data would allow her bank to identify markets and communities that may particularly benefit from the Bank of Jabez's services. For example, Ms. Young is familiar with local communities and neighborhoods that are underserved, and has been meeting with local churches and other community organizations to learn about local needs and discuss the Bank of Jabez's plans. Similarly, she has worked with groups of small business owners in Texas, Nebraska, and other states to identify areas that would benefit from increased small business lending. Section 1071 data would allow her to find similarly underserved communities in other parts of Iowa and across the country, helping her expand the Bank of Jabez into areas with which she and her partners have less familiarity.

107.    Section 1071 data will also help Ms. Young design the Bank of Jabez's offerings. As a new, client-focused bank, the Bank of Jabez will have more flexibility than some established banks to tailor their financial products to marketplace needs. Analyzing Section 1071 data would allow Ms. Young and her team to more precisely pinpoint the gaps in available lending and understand what products would fill those gaps.

108.    Having Section 1071 data would also help Ms. Young and the Bank of Jabez satisfy financial supervision requirements. As part of their initial filings and continuing supervision, they will need to provide regular reports on the markets in which they operate. Section 1071 data would make those reports more complete and easier to compile, saving Ms. Young and the Bank time and resources.

109.    This data would also help Ms. Young collaborate with other banks. In addition to direct loans, the Bank of Jabez will undertake participation loans, where they take on a significant portion of the risk of a loan that another bank is making. Section 1071 data would help them determine which banks outside their local community would make good partners based on their track records for non-discriminatory small business lending.

110.    Ms. Young's experience with HMDA data confirms the benefit that Section 1071 data will provide. HMDA data has allowed her to see the percentages of various demographics and zip codes where home loans are disproportionately denied. And it allows her to see zip codes where banks don't grant home loans to local residents at all, instead providing loans only to non-local investors. This allows the Bank of Jabez to thoughtfully market to homeowners that may be interested in its services, and to design products that will be both appealing and financially sensible. But until CFPB begins collecting Section 1071 data and making it available, Ms. Young's ability to do the same for small business owners will be severely limited.

## V.    CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF

### COUNT ONE
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
### 5 U.S.C. § 706(1)

111.    Plaintiffs re-allege and reincorporate the paragraphs above as fully set forth herein.

112.    The APA provides a remedy to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

113.    Section 1071 requires Defendants to collect, maintain, and publish data about credit applications by women-owned, minority-owned, and small businesses. *See* 15 U.S.C. § 1691c-2(b), (f). It further requires the Bureau to prescribe rules and guidance to carry out these requirements. *Id.* § 1691c-2(g)(1).

114.    By refusing to collect, maintain, and publish data as required by Section 1071, Defendants are unlawfully withholding and unreasonably delaying agency action.

### COUNT TWO
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
### 5 U.S.C. § 706(2)(A), (C)

115.    Plaintiffs re-allege and reincorporate the paragraphs above as fully set forth herein.

116.    The APA provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §§ 706(2)(A), (C).

117.    Section 1071 requires financial institutions to inquire whether businesses applying for loans are women-owned, minority-owned, or small businesses, and maintain a record of the responses. 15 U.S.C. § 1691c-2(b). It further requires financial institutions to compile and maintain specifically enumerated data regarding loan applications. *Id.* § 1691c-2(e). It requires financial institutions to submit this data to CFPB, which must retain it for three years and make it public annually and on request. *Id.* §§ 1691c-2(f)(1)–(2).

118.    As reflected in the press release, Defendants consciously and expressly adopted a general policy of abdicating their statutory responsibility to enforce Section 1071.

119.    In the press release and the 2025 IFR, Defendants have countermanded Congress's requirements by purporting to relieve financial institutions of their statutory obligation to compile, maintain, and submit this data.

120.    Defendants are refusing to comply with Congress's command that it make Section 1071 data publicly available.

121.    Defendants lack any statutory authority to set aside the explicit requirements that Congress directly imposed on financial institutions in Section 1071.

122.    Accordingly, Defendants have acted not in accordance with law, and in excess of statutory authority.

## COUNT THREE
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(D)

123.    Plaintiffs re-allege and reincorporate the paragraphs above as fully set forth herein.

124.    The APA provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be … without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

125.    Agencies cannot issue substantive rules without following the notice-and-comment rulemaking procedures set out in the APA. *See* 5 U.S.C. § 553. Nor can they amend previously issued substantive rules without following those procedures.

126.    Defendants' general policy of abdicating their statutory responsibilities under Section 1071, announced in the press release, is a substantive rule and final agency action, because it categorically relieves regulated entities of their obligation to comply with Section 1071 or the Lending Transparency Rule.

127.    The 2025 IFR's delay of the Lending Transparency Rule's compliance deadlines furthers Defendants' general non-enforcement policy. It is also independently a substantive rule and final agency action because it relieves regulated entities of their obligation to comply with Section 1071 or the Lending Transparency Rule for one year.

128.    Defendants promulgated each decision implementing their policy of abdication without notice and comment.

129.    Defendants amended the Lending Transparency Rule's compliance deadlines in the 2025 IFR without notice and comment.

130.    An agency may bypass notice-and-comment rulemaking requirements if the "agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). This good cause exception is narrowly construed.

131.    CFPB did not have "good cause" to implement a general non-enforcement policy of Section 1071 without notice and comment. Nor did CFPB have "good cause" to issue the 2025 IFR without notice and comment.

132.    CFPB's invalid good cause justification improperly circumvents the notice-and-comment protections of the APA. 5 U.S.C. § 553(b).

133.    Accordingly, Defendants have acted without observance of procedure required by law. CFPB's policy of not enforcing Section 1071, including through the 2025 IFR, is thus invalid.

**COUNT FOUR**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,**
**5 U.S.C. § 706(2)(A)**

134.    Plaintiffs re-allege and reincorporate the paragraphs above as fully set forth herein.

135.    The APA provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary [and] capricious." 5 U.S.C. § 706(2)(A).

136.    In adopting their policy of abdication and promulgating the 2025 IFR, Defendants relied on factors that Congress did not intend them to consider, failed to consider important aspects of the problem Congress directed them to address, disregarded facts and circumstances that underlay the Lending Transparency Rule, offered an explanation that was pretextual and contradicted by its own actions, ignored obvious alternatives, and injured reliance interests.

137.    Accordingly, Defendants' actions are arbitrary and capricious.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(1)    Declare Defendants in violation of the APA and Section 1071, 15 U.S.C. § 1691c-2;

(2)    Declare invalid, vacate, and set aside Defendants' policy of not enforcing Section 1071 and the Lending Transparency Rule;

(3)     Declare invalid, vacate, and set aside Defendants' 2025 IFR and order Defendants immediately to cease implementation and/or enforcement of the 2025 IFR;

(4)    Award Plaintiffs their attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

(5)    Grant such other and further relief as this Court deems proper.


DATED: July 23, 2025                          Respectfully submitted,


                                               /s/ Rachel Fried_____
                                              Rachel Fried (DC Bar No. 1029538)
                                              Pooja A. Boisture
                                              (*pro hac vice application to be filed*)
                                              Robin F. Thurston (DC Bar No. 1531399)
                                              Skye L. Perryman (DC Bar No. 984573)

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 448-9090
Facsimile: (202) 701-1775
rfried@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*