**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RISE ECONOMY, et al., | |
| Plaintiffs, | |
| v. | |
| RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, et al., | Case No. 1:25-cv-2374 (DLF) |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 6

STANDARDS .................................................................................................................. 13

ARGUMENTS ................................................................................................................. 14

   I.  Plaintiffs' Claims Should Be Dismissed for Lack of Standing As They Cannot Satisfy Article III's Traceability and Redressability Requirements .............................................. 14

   II. Plaintiffs' Claim That Defendants Acted Arbitrarily and Capriciously When Enacting the Final Rule Is Meritless ................................................................................................ 18

   III.  The Claim That the Bureau Unlawfully Withheld or Unreasonably Delayed Agency Action Fails:  This is a Case About Action, Not Inaction, and, in Any Case, There Was No Unreasonable Delay ....................................................................................................... 25

      A. Plaintiffs Have Not Identified a Required, Discrete Agency Action ......................... 26

      B. The *TRAC* Factors Do Not Support Plaintiffs' § 706(1) Claim ................................. 29

      C. Vacatur is Not Available for § 706(1) Claims .......................................................... 33

   IV.  Counts Two and Six Fail:  There Is No Viable Claim That the Bureau, in Issuing the Final Rule, IFR, or Press Release, Acted Contrary to Law or Exceeded Its Statutory Authority ........................................................................................................................ 34

      A. The IFR-Related Statutory Authority Claim Is Moot ................................................ 34

      B. Plaintiffs' Statutory Authority Claim Lacks Merit As to the IFR and Final Rule Because the Bureau Has Not Purported to Excuse Entities from Their Statutory Obligation ................................................................................................................ 35

      C. Plaintiffs' Press Release-Related Statutory Authority Claim Should Be Rejected Because Plaintiffs Lack Standing, the Press Release is Not Final Agency Action, and the Claim Fails on the Merits .................................................................................... 36

   V. Plaintiffs' Notice-and Comment Count Is Moot (as to the IFR) and Is Not Justiciable and Without Merit (as to the Press Release) ........................................................................ 39

   VI.  Defendants Should Prevail on Count Four Because the Policy of Abdication is Not Reviewable Under the APA and the IFR-Related Claims Are Moot ................................. 41

CONCLUSION ................................................................................................................. 43

ii

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*Afghan & Iraqi Allies v. Blinken*,
   103 F.4th 807 (D.C. Cir. 2024) ................................................................. 29, 31

*Alameda Cnty. Med. Ctr. v. Becerra*,
   2024 WL 3536620 (D.D.C. June 24, 2024) ............................................................ 13

*Am. Anti-Vivisection Soc'y v. United States Dep't of Agric.*,
   946 F.3d 615 (D.C. Cir. 2020) ...................................................................... 37

\**Am. Forest Res. Council v. United States*,
   77 F.4th 787 (D.C. Cir. 2023),
   144 S. Ct. 1110, 218 L. Ed. 2d 348 (2024) ................................................ 26, 27, 28

*Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*,
   738 F.3d 387 (D.C. Cir. 2013) ..................................................................... 40

*Am. Waterways Operators v. United States Coast Guard*,
   613 F. Supp. 3d 475 (D. Mass. 2020) ............................................................... 20

\**Ass'n of Am. Physicians & Surgeons v. Sebelius*,
   746 F.3d 468 (D.C. Cir. 2014) ..................................................................... 34,

*Ass'n of Priv. Sector Colleges & Univ. v. Duncan*,
   681 F.3d 427, 441 (D.C. Cir. 2012) ................................................................. 19

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
   785 F.3d 710 (D.C. Cir. 2015) .................................................................. 37, 38,

*Beck Chevrolet Co. v. Gen. Motors LLC*,
   787 F.3d 663 (2d Cir.) .............................................................................. 7

*Bennett v. Spear*,
   520 U.S. 154 (1997)................................................................................ 37

*Broadgate Inc. v. U.S. Citizenship & Immigr. Servs.*,
   730 F. Supp. 2d 240 (D.D.C. 2010) ................................................................. 40

*Carlson v. Postal Regulatory Commission*,
   938 F.3d 337 (D.C. Cir. 2019) .......................................................................

*City of Portland, Oregon v.*
   507 F.3d 706 (D.C. Cir. 2007) ...................................................................... 24

*Cobell v. Norton*,
   240 F.3d 1081 (D.C. Cir. 2001) ..................................................................... 42

*Columbia Gulf Transmission, LLC v. FERC*,
106 F.4th 1220 (D.C. Cir. 2024) .......................................................... 14, 36

*Ctr. for Biological Diversity v. Zinke*,
260 F. Supp. 3d 11 (D.D.C. 2017) .............................................................. 28

*Dahl v. Dickson*,
2020 WL 6887925 (D.D.C. Nov. 24, 2020) ..................................................

*Delta Constr. Co. v. EPA*,
783 F.3d 1291 (D.C. Cir. 2015) .................................................................. 15

*Didrickson v. U.S. Dep't of Interior*,
982 F.2d 1332 (9th Cir. 1992) .................................................................... 20

*Edison Electric Institute v. EPA*,
996 F.2d 326 (D.C. Cir. 1993) .................................................................... 37

*Env't Def. Fund, Inc. v. Costle*,
657 F.2d 275 (D.C. Cir. 1981) .................................................................... 38

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .................................................................................. 21

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .................................................................................. 14

*Fed. Election Comm'n v. Rose*,
806 F.2d 1081 (D.C. Cir. 1986) .................................................................. 31

*Florida Power & Light Company v. EPA*,
145 F.3d 1414 (D.C. Cir. 1998) .................................................................. 37

*\*FDA v. Wages & White Lion Invs.*,
604 U.S. 542 (2025) .................................................................................. 22

*Fulani v. Brady*,
935 F.2d 1324 (D.C. Cir. 1991) ............................................................. , 17

*Grand Canyon Air Tour Coal. v. FAA*,
154 F.3d 455 (D.C. Cir. 1998) .................................................................... 30

*Heckler v. Chaney*,
470 U.S. 821 (1985) .................................................................................. 20

*In re Barr Laby's., Inc.*,
930 F.2d 72 (D.C. Cir. 1991) ....................................................................

*In re International Chem. Workers Union*,
  958 F.2d 1144 (D.C. Cir. 1992) ................................................................. 31

*Iron Workers Dist. Council of S. Ohio & Vicinity Benefit Tr. v. Cmty. Ins. Co.*,
  2025 WL 316229 (S.D. Ohio Jan. 28, 2025) ............................................... 2

*Jackson v. Mabus*,
  808 F.3d 933 (D.C. Cir. 2015) ................................................................... 18

*Jacksonville Urb. League, Inc. v. Azar*,
  2019 WL 3208686 (D.D.C. July 16, 2019) ................................................ 13

*Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*,
  909 F.3d 446 (D.C. Cir. 2018) ................................................................... 15

*Kentucky v. Graham*,
  473 U.S. 159 (1985) ..................................................................................... 2

*Landmark Hosp. of Salt Lake City v. Azar*,
  442 F. Supp. 3d 327 (D.D.C. 2020) .......................................................... 13

*Las Americas Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec.*,
  2025 WL 1403811 (D.D.C. May 9, 2025) ............................................ 34, 40

*Level the Playing Field v. FEC*,
  381 F. Supp. 3d 78 (D.D.C. 2019) ............................................................ 38

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  591 U.S. 657 (2020) ................................................................................... 39

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................................... 14

*\*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ............................................................................. 41, 42

*Marshall County Health Care Authority v. Shalala*,
  988 F.2d 1221 (D.C. Cir. 1993) ................................................................... 3

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
  336 F.3d 1094 (D.C. Cir. 2003) ................................................................. 30

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ................................................................. 40

*Montanans For Multiple Use v. Barbouletos*,
  568 F.3d 225 (D.C. Cir. 2009) ................................................................... 28

v

*Motor Vehicle Mfrs Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................................. 8, 18, 19

*Nat. Res. Def. Council v. EPA*,
   808 F.3d 556 (2d Cir. 2015) ...................................................................................

*Nat'l Ass'n of Home Builders v. EPA*,
   682 F.3d 1032 (D.C. Cir. 2012) ......................................................................... 21, 30

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ............................................................................................. 26, 28

*Ohio v. EPA*,
   603 U.S. 279 (2024) .................................................................................................. 30

*Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*,
   822 F.2d 1105 (D.C. Cir. 1987) ............................................................................... 38

*People for the Ethical Treatment of Animals v. United States Dep't of Agric. & Animal & Plant Health Inspection Serv.*,
   918 F.3d 151 (D.C. Cir. 2019) ................................................................................. 32

*Pub. Citizen v. Nuclear Regul. Comm'n*,
   845 F.2d 1105 (D.C. Cir. 1988) ............................................................................... 33

*Pub. Citizen Health Rsch. Grp. v. Acosta*,
   363 F. Supp. 3d 1 (D.D.C. 2018) ............................................................................. 39

*Pub. Emps. for Env't Resp. v. Beaudreau*,
   25 F. Supp. 3d 67 (D.D.C. 2014) ............................................................................. 18

*Reytblatt v. Nuclear Regulatory Comm'n*,
   105 F.3d 715 (D.C. Cir. 1997) ................................................................................. 23

*Ry. Lab. Executives' Ass'n v. U.S. R.R. Ret. Bd.*,
   842 F.2d 466 (D.C. Cir. 1988) ................................................................................. 34

*Samma v. Dep't of Def.*,
   136 F.4th 1108 (D.C. Cir. 2025) ..............................................................................

*Smith v. Reilly*,
   671 F. Supp. 2d 123 (D.D.C. 2009) ......................................................................... 13

*Soundboard Ass'n v. FTC*,
   888 F.3d 1261 (D.C. Cir. 2018) ............................................................................... 40

*Sprint Commc'ns Co. v. APCC Services, Inc.*,
   554 U.S. 269 (2008) ........................................................................................... 14, 17

*Swanson Grp. Mfg. LLC v. Jewell*,
   790 F.3d 235 (D.C. Cir. 2015) ............................................................... 15

*\*Telecomm. Rsch. & Action Ctr. v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984) ...................................................... *passim*

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ............................................................................... 14

*United States v. McGill*,
   815 F.3d 846 (D.C. Cir. 2016) ............................................................... 43

*Util. Air. Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ........................................................................ 35, 39

*W. Org. of Res. Councils v. Zinke*,
   892 F.3d 1234 (D.C. Cir. 2018) ............................................................. 26

*Wilson v. US Bank Nat'l Ass'n*,
   2022 WL 22316423 (D.D.C. Dec. 10, 2022) ......................................... 13

**Statutes**

5 U.S.C. § 551(13) ...................................................................... 26, 27

5 U.S.C. § 702 .................................................................................. 42

5 U.S.C. § 706(1) ..................................................................... *passim*

5 U.S.C. § 706(2) .............................................................. 33, 36, 37

5 U.S.C. § 706(2)(A) ........................................................ 12, 18, 41

5 U.S.C. § 706(2)(C) ........................................................................ 12

15 U.S.C. § 1691c-2 ....................................................................... 1, 6

15 U.S.C. § 1691c-2(a) ....................................................................... 7

15 U.S.C. § 1691c-2(e)(1), (f)(1) ...................................................... 26

15 U.S.C. § 1691c-2(e)(2)(B), (E), (G) ............................................... 7

15 U.S.C. § 1691c-2(e)(2)(H) ............................................................. 8

15 U.S.C. § 1691c-2(f)(1) ............................................................. 7, 25

15 U.S.C. § 1691c-2(f)(2) ........................................................... 26, 27

15 U.S.C. § 1691c-2(f)(2)(C) ................................................................ 7, 25

15 U.S.C. § 1691c-2(g) ................................................................................ 7

15 U.S.C. § 1691c-2(g)(1) ....................................................................... 7, 25

Pub. L. No. 111–203, 124 Stat. 1376 (2010) ............................................... 6

**Regulations**

12 C.F.R. § 1002.107(a)(12) ......................................................................... 7

12 C.F.R. § 1002.107(a)(18) ......................................................................... 8

40 C.F.R. § 1507.3(a) ................................................................................. 28

Ensuring Lawful Governance and Implementing the President's "Department of Government
  Efficiency" Deregulatory Initiative, EO 14219,
  90 Fed. Reg. 10583 (Feb. 19, 2025) .......................................................... 9

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B);
  Extension of Compliance Dates, Final Rule,
  90 Fed. Reg. 47514 (Oct. 2, 2025) .................................................... *passim*

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B);
  Extension of Compliance Deadlines, Interim Final Rule,
  89 Fed Reg. 55024 (July 3, 2024) .......................................................... 8, 22

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B);
  Extension of Compliance Dates, Interim Final Rule or IFR,
  90 Fed. Reg. 25874 (June 18, 2025) ................................................. *passim*

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), Final Rule,
  88 Fed. Reg. 35150 (May 31, 2023) ........................................................... 7

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), Proposed Rule,
  90 Fed. Reg. 50952 (Nov. 13, 2025) ...................................................... 2, 11

**Other Authorities**

Kalyani Munshani, *Security Concern or Economic Motivations? The Regulation of Informal
  Value Transfer Systems*, 12 Or. Rev. Int'l L. 77 (2010) ............................ 16

## INTRODUCTION

In 2023, the Consumer Financial Protection Bureau issued a sprawling 422-page preamble and rule entitled "Small Business Lending Under the Equal Opportunity Act (Regulation B)" [the 2023 Rule or the Small Business Lending Rule].  The 2023 Rule implements § 1071 of the Dodd Frank Act, which creates a framework for collecting small business lending data.  *See* 15 U.S.C. § 1691c-2 (codifying § 1071).

The Bureau interpreted the scope of its authority under the statute broadly, instructing financial institutions to collect — for eventual dissemination by the Bureau — sensitive information beyond that required by the statute, including loan-pricing data and information about whether small businesses applying for credit are majority-owned by individuals who identify as LGBTQI+.  The result was a complex and expansive rule that, rather than protecting the trillion-dollar-plus small business lending market as intended, risks disrupting it and poses particular difficulties for smaller lenders.

The Bureau's expansive assertion of regulatory authority triggered three federal lawsuits, and the courts hearing those suits ultimately issued orders staying the implementation of the 2023 Rule as to the parties before them (and, in the case of association litigants, their members). These broad stays, which apply to the members of some of the largest financial services trade organizations in the country, not only provide relief to much of the regulated community (in the form of delayed compliance deadlines), but they afforded the new Bureau leadership an opportunity to reevaluate the 2023 Rule in light of the current Administration's regulatory goals. As part of that reassessment—and in the interest of fairness for entities not covered by the court-issued stays—the Bureau extended the 2023 Rule's compliance dates for all, through an interim final rule followed by a comment period and the issuance of a final rule.  Before completing the compliance date rulemaking, the Bureau, as an interim palliative step, issued a press release in

April 2025 (Press Release) explaining that it would not prioritize enforcement of the Rule with respect to entities not covered by the stays.  And the Bureau has now proposed revising the Rule with the aim of streamlining its requirements, reducing complexity for lenders, and improving data quality. *See* Small Business Lending Under the Equal Credit Opportunity Act (Reg. B), 90 Fed. Reg. 50952 (Nov. 13, 2025).

Plaintiffs—three community development organizations and an individual—would prefer that the 2023 Rule's compliance dates be frozen in amber.  They don't like the court-issued stays. They don't like the extension of the compliance dates.  They want the Bureau to require an unspecified subset of financial institutions to collect and maintain all of the dates mandated by the expansive 2023 Rule as written, even though the court-issued stays mean that many of the largest lenders wouldn't have to comply with the 2023 Rule.  Thus, Plaintiffs have filed a four-count complaint and three-count supplemental complaint raising Administrative Procedure Act claims, and a motion seeking summary judgment (on all of their claims).[1]

But Plaintiffs' complaints and motion offer no basis for the Court to inject itself into the ongoing regulatory process.[2]  For starters, Plaintiffs have not adequately alleged, much less demonstrated (as they must at the summary judgment stage) that they have constitutional standing to sue.  As noted above, three federal courts issued orders staying, for many entities, the obligation to comply with Rule.  And Plaintiffs do not show that they've been harmed by the

---

[1] Plaintiffs name the Bureau and Russell Vought, in his official capacity as Acting Director of the Bureau, as Defendants.  Because a suit against the head of an agency in his official capacity is effectively a suit against the agency itself, *see Kentucky v. Graham*, 473 U.S. 159, 166 (1985), this memorandum often refers to both Defendants as "the Bureau."

[2] A supplemental complaint, unlike an amended complaint, does not supersede the original complaint.  *See, e.g., Iron Workers Dist. Council of S. Ohio & Vicinity Benefit Tr. v. Cmty. Ins. Co.,* No. 3:23-CV-362, 2025 WL 316229, at *1 (S.D. Ohio Jan. 28, 2025).  Thus, both complaints are operative.

Bureau's conduct, as opposed to these court-issued stays.  To wit, Plaintiffs don't demonstrate that the alleged harm they will suffer from the lack of § 1071 data is traceable to the data loss attributable to entities covered by the stay.  Nor, relatedly, do they demonstrate that any order issued by this Court will cure any harm they've suffered, given that the stays issued by the other courts are not at issue (and, in any case, are out of reach).  This jurisdictional failing suffices to warrant dismissal of Plaintiffs' entire case.

Even setting standing aside, the Court should dismiss, or enter summary judgment in favor of Defendants, on all seven counts in the Complaint and Supplemental Complaint.[3]

**Count Seven:**  Here, the last shall be first:  We start with Plaintiffs' last Count (Count Seven)—the allegation that the Bureau acted arbitrarily and capriciously when enacting the final rule extending the compliance dates—because it is the crux of their case.  Even though much of Plaintiffs' brief focuses on the Bureau's alleged inaction, this is not an inaction case under governing precedent.  Plaintiffs' primary grievance is not that the Bureau failed to take action, but rather than it took an improper action: postponing the compliance dates.  And one tell is in the relief they seek.  Even for their claim that the Bureau has delayed or withheld action, they seek vacatur — relief designed to *undo what has been done* — as the remedy.  As for the merits

---

[3] At the time the Bureau jointly proposed a schedule for dispositive motion briefing, it did not indicate that it would move for summary judgment.  But Plaintiffs' argument in favor of summary judgment on Count Seven relies on citations to comments that are not incorporated into the pleadings.  *Compare* Revised SJ Memo. at 36-41 with Supp. Compl.  The Court could resolve Plaintiffs' comment-based claim on a motion to dismiss, *Marshall County Health Care Authority v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993), and, for that reason, Defendants move to dismiss this claim, along with the others.  That said, the better practice—to avoid questions about what's in-bounds and what's not— is to consider such record-based arguments at summary judgment.  *Id*. at 1226 n.5.  And resolving all of the claims at summary judgment would ensure a more efficient resolution of the case by avoiding any later redundant briefing.  (Importantly, in addressing Count Seven, the Bureau relies on the same record evidence as Plaintiffs, so there is no concern about surprise or, by extension, the fairness of the schedule.)  Thus, the Bureau also moves for summary judgment on all of Plaintiffs' claims.

of Count Seven, there is not much to see. The arbitrary and capricious standard is a deferential one. And the Bureau satisfied it when providing its rationale for the relatively short compliance date extension—*i.e.*, the need for clear and uniform compliance dates and reconsideration of lingering concerns with the Small Business Lending Rule—and when responding to comments.

**Counts One and Five:** Next, we turn to Plaintiffs' (errant) focus: the allegations, found in virtually identical form in Counts One and Five, that that the Bureau has impermissibly delayed agency action by refusing to collect, maintain, and publish data as required by § 1071, in violation of 5 U.S.C. § 706(1). These claims fail because the allegedly untaken action (namely, the collection, maintenance, and publication of data) is neither currently required nor the kind of action (i.e., rights-determining and discrete) that courts can compel under the APA. Indeed, financial institutions have not yet obtained or submitted to the Bureau the data that Plaintiffs contend the Bureau has delayed in collecting, maintaining, and publishing. That's enough to justify dismissal of the first count, but there's more. Plaintiffs turn to familiar precedent for determining whether an agency's delay in taking an action is unreasonable. *See, e.g., Telecomm. Rsch. & Action Ctr. (TRAC) v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984). But, under the *TRAC* analysis, the Bureau's delay is reasonable: The Bureau has applied a "rule of reason," in the sphere of economic regulation, and has done so in good faith. *See id.* Finally, Plaintiffs seek vacatur of the final compliance date rule (Final Rule), interim compliance date rule (IFR), and the Press Release as relief for the violation of § 706(1) that Plaintiffs attempt to allege in Count One. But vacatur is not an available remedy under § 706(1).

**Counts Two and Six:** Counts Two and Six comprise the nearly identical allegations that the Bureau broke the law, through the Final Rule, IFR and the Press Release, by purporting to change the terms of § 1071 and by abdicating its responsibility to implement the law. These

claims fare no better than the rest.  For one thing, the IFR-based claim is moot because the IFR has been superseded by the final compliance date rule.  In any event, the Final Rule and the IFR do not purport to alter any statutory requirement, nor do they abdicate any implementation responsibility; they simply moved compliance deadlines created by the Bureau.  And Plaintiffs' allegations find no better footing with respect to the Press Release, running into a litany of insurmountable obstacles:  1) Plaintiffs lack standing to challenge the Press Release because it was superseded by the IFR before the complaint was filed; 2) the Press Release is not reviewable final agency action; and 3) the Press Release provided guidance regarding the Bureau's enforcement priorities (a matter squarely within its discretion)—it did not abdicate any implementation responsibilities or purport to modify a statute.

**Count Three:** Count Three comprises the claim that the Bureau should have provided notice and an opportunity for comment when it issued the Press Release and the interim final rule extending the compliance deadlines.  It should also be decided in favor of Defendants.  Plaintiffs have no valid notice-and-comment claim related to the IFR or the Press Release.  Again, the IFR-related claim is moot following the issuance of the Final Rule.  Similarly, the Press Release-focused claim misses the mark because Plaintiffs lack standing to challenge it and, to sound a familiar refrain, the Press Release was not final agency action. In any case, the Press Release is agency guidance, not a legislative rule to which notice-and-comment obligations attach.

**Count Four:** Finally, there's Count Four.  It is made up of claims that the Bureau acted arbitrarily and capriciously "in adopting [its] policy of abdication" and issuing the IFR.  It deserves the same fate as the other claims: dismissal or judgment in favor of Defendants.[4]  The

---

[4] Plaintiffs never clearly define the term "policy of abdication," but it apparently comprises acquiescing to stays sought in other litigation, issuing the Press Release, and promulgating the IFR.  See Section VI below.

so-called policy of abdication is not a discrete action reviewable under the APA.  What is more—and this should be old hat by now—the IFR-directed claim is moot, as the IFR has been superseded by the final compliance date rule.  Crucially, Plaintiffs provide no substantial argument to the contrary, mentioning the claim only in passing in their summary judgment brief. Memo. in Supp. of Mot. for Summ. J., Oct. 29, 2025, ECF No. 31-1 (Revised SJ Memo.) at 41.

For the reasons stated above, as more fully elaborated below, the Court should reject Plaintiffs' efforts to upend the ongoing regulatory process.[5]  Dismissal of the Complaint and Supplemental Complaint, or entry of judgment in favor of Defendants on all claims, is warranted.  Plaintiffs' motion for summary judgment should, therefore, also be denied.

## STATEMENT OF FACTS

The Dodd-Frank Wall Street Reform and Consumer Protection Act created the Bureau and entrusted it with various responsibilities.  Pub. L. No. 111–203, 124 Stat. 1376 (2010).  One of those responsibilities is enacting regulations to implement § 1071 of the Act, which establishes the framework for a new data collection regime for small business loans. *See* 15 U.S.C. § 1691c-2.  More specifically, § 1071 amends the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*., to require financial institutions to collect, report, and make public certain information concerning credit applications made "for women-owned, minority-owned, and small business[es]," including "the type and purpose of the loan or other credit being applied for," "the census tract in which is located the principal place of business" of the applicant,[6] and "the race,

---

[5] Plaintiffs don't clearly explain what relief would be warranted if they were to prevail, given that the compliance deadlines from the 2024 rule have passed.  Remand without vacatur, allowing the agency to set new deadlines consistent with this court's decision without the confusion caused by subjecting entities to the compliance deadlines from the 2024 rule in the interim, would be appropriate.

[6] "According to the United States Census Bureau, Census Tracts are small, relatively permanent statistical subdivisions of a county or equivalent entity that are updated by local participants prior

sex, and ethnicity of the principal owners of the business." 15 U.S.C. § 1691c-2(e)(2)(B), (E), (G). The financial institutions must also annually submit to the Bureau the information they collect, *id.* § 1691c-2(f)(1), and the Bureau is obliged to annually make the data available to the public, *id.* § 1691c-2(f)(2)(C). These obligations are triggered by an implementing regulation issued by the Bureau. *See id.* § 1691c-2(g).

Dodd-Frank speaks in general terms about how the Bureau should exercise its § 1071 rulemaking authority. For example, it states that "[t]he Bureau shall prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to this section." *See* 15 U.S.C. § 1691c-2(g)(1). And the purposes section of the statute is similarly broad: "The purpose of this section is to facilitate enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses." *Id.* § 1691c-2(a).

In 2023, the Bureau issued a 422-page preamble explaining its rule implementing § 1071, and, in doing so, the Bureau chose to exercise its power broadly. *See* Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), 88 Fed. Reg. 35150, 35165 (May 31, 2023) (Final Rule). For example, the Bureau decided to require financial institutions to collect and report to the Bureau detailed pricing information for credit transactions "originated or approved but not accepted," including information about interest rates, origination charges, and other charges. 12 C.F.R. § 1002.107(a)(12). It also chose to require financial institutions to

---

to each decennial census as part of the Census Bureau's Participant Statistical Areas Program."
*Beck Chevrolet Co. v. Gen. Motors LLC*, 787 F.3d 663, 667 (2d Cir.), *certified question accepted*,
25 N.Y. 3d 1057, 33 N.E.3d 496 (2015), *and certified question answered*, 27 N.Y. 3d 379, 53
N.E.3d 706 (2016) (quotation marks omitted).

collect information about whether businesses applying for credit are majority-owned by individuals who identify as LGBTQI+. *Id.* § 1002.107(a)(18). The statute does not require the collection of either category of information; instead, the Bureau exercised its discretion under a catch-all provision to require the collection of this information. *See also* 15 U.S.C. § 1691c-2(e)(2)(H) (stating that financial institutions must also provide "any additional data that the Bureau determines would aid in fulfilling the purposes of this section"). The Bureau's approach has drawn significant objections, as exemplified by the filing of three federal suits challenging the 2023 Rule. *See Texas Bankers Ass'n v. CFPB*, 7:23-cv-144 (S.D. Tex. filed April 26, 2023); *Monticello Banking Co. v. CFPB*, No. 23-cv-148 (E.D. Ky. filed Aug. 11, 2023); *Revenue Based Finance Coalition v. CFPB*, 1:23-cv-24882 (S.D. Fla. filed Dec. 26, 2023). In the summer of 2024, the Bureau issued a rule delaying, for all regulated entities, the compliance deadlines that had been set in the Small Business Lending Rule, as the ongoing litigation had already resulted in extensions of the deadlines for certain entities. *See* Small Business Lending Under the Equal Credit Opportunity Act (Reg. B); Extension of Compliance Deadlines, 89 Fed Reg. 55024 (July 3, 2024).

Following the issuance of the 2023 Rule, new leadership took the helm at the Bureau as part of the change in Administrations. As often occurs, the new leadership decided to examine existing regulations to ensure that they align with the new administration's policy preferences. *See, e.g.,* Appellees Suppl. Resp. to Mot to Stay at 2, *Texas Bankers Ass'n v. CFPB*, 24-20705 (5th Cir. Feb. 5, 2025), Dkt. No. 129 (explaining that the Bureau did not object to a stay of deadlines "to give the Acting Director time to consider the issues"); *cf. Motor Vehicle Mfrs Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part) ("A change in administration brought about by the

people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations. As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration.").  In the current administration, those policy preferences include (among other things) limiting the regulatory burden imposed by federal agencies, including the Bureau.  *See, e.g.,* Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative, EO 14219, 90 Fed. Reg. 10583 (Feb. 19, 2025) ("It is the policy of my Administration to focus the executive branch's limited enforcement resources on regulations squarely authorized by constitutional Federal statutes, and to commence the deconstruction of the overbearing and burdensome administrative state.").

As the new Bureau leadership was in the process of evaluating the existing § 1071 Small Business Lending Rule to determine its alignment with the new Administration's priorities, it did not oppose requests, lodged in the pending federal cases, to extend the regulatory compliance deadlines. Supp. Resp. to Mot. to Stay, *Texas Bankers Ass'n v. CFPB*, No. 24-40705 (5th Cir Feb. 5, 2025), Dkt. No. 129; Reply, *Monticello Banking Co. v. CFPB*, No. 6:23-cv-00148-KKC (E.D. Ky. Feb. 11, 2025), Dkt. No. 46, Administrative Record (AR) at 629-33; Resp. to Mot. to Stay, *Revenue Based Fin. Coal. v. CFPB*, 1:23-cv-24882 (S.D. Fla. Apr. 3, 2025), Dkt. No. 75, AR at 514-17.  The courts granted these requests, extending the regulatory compliance deadlines for Plaintiffs, Intervenors, and the members of the associational parties. Order*, Texas Bankers Ass'n v. CFPB*, No. 24-40705 (5th Cir. Feb. 7, 2025), Dkt. No. 134-2 (tolling compliance

deadlines pending further order), AR 546-50[7]; Order, *Monticello Banking Co. v. CFPB*, No. 6:23-cv-00148 (E.D. Ky. Mar. 11, 2025), Dkt. No. 48 (same), AR 508-13; Order on Mot. to Stay, *Revenue Based Fin. Coal. v. CFPB*, 1:23-cv-24882 (S.D. Fla. May 6, 2025), Dkt. No. 81 (entering stay of compliance deadlines for length of Fifth Circuit stay), AR at 518-20.

Shortly after the courts entered the first two of these stay orders, the Bureau issued a press release providing guidance about how it planned to exercise its enforcement discretion with respect to the Small Business Lending Rule. CFPB, Press Release, *CFPB Keeps Its Enforcement and Supervision Resources Focused on Pressing Threats to Consumers*, April 30, 2025 (as noted earlier, also Press Release), AR at 427-28. In it, the Bureau explained that, with respect to the Small Business Lending Rule, it would "not prioritize enforcement or supervision actions with regard to entities that are currently outside the stay imposed under *Texas Bankers Association v. CFPB*, No. 24-40705 (CA5)." *Id.* at 427. The Bureau decided to deprioritize enforcement of these entities "in the interest of focusing resources on supporting hard-working American taxpayers" and "because of the unfairness of enforcing [the Small Business Lending Rule] against entities not protected by the court's stay but similarly situated to parties that are protected by the stay." *Id.* The Bureau closed the Press Release by noting that it "looks forward to resolving the status of this regulation and ensuring fair, consistent treatment for all entities impacted by the regulation." *Id.*

The Bureau took the first step toward "resolving the status of this regulation" when it issued an interim final rule delaying the deadline for complying with Small Business Lending Rule for almost a year. Small Business Lending Under the Equal Credit Opportunity Act

---

[7] Plaintiff RISE attempted to intervene in the Fifth Circuit case, but its motion was denied. Order, *Texas Bankers Ass'n*, No. 24-40705, Dkt. No. 91. And its motion for reconsideration was also denied. *Id.*, Dkt. No. 127.

(Regulation B); Extension of Compliance Dates (Interim Final Rule or IFR), 90 Fed. Reg. 25874, 25875 (June 18, 2025), AR at 1-10.  As the Bureau noted, "three courts have stayed the compliance dates set forth in the 2024 interim final rule," but "compliance dates have not been stayed for those who are not plaintiffs or intervenors in those cases. To facilitate consistent compliance across all covered financial institutions, the CFPB is extending the compliance dates set forth in the 2024 interim final rule by approximately one year." *Id.*  This extension of the compliance deadlines, the Bureau estimated, "should be sufficient . . . for the CFPB to issue a new proposal to reconsider certain aspects of the 2023 final rule." *Id.*  As part of the June 18, 2025 IFR, the Bureau provided a 30-day period for the submission of comments.  IFR, 90 Fed. Reg. 25874.

After considering comments received on the IFR, the Bureau issued another rule finalizing the IFR's extension of the regulatory compliance deadlines.  Small Business Lending Under the Equal Credit Opportunity Act (Reg. B); Extension of Compliance Dates, 90 Fed. Reg. 47514 (Oct. 2, 2025) (Final Rule), AR at 11-20; AR at 757-61, 774-780, 852-858 (some of the comments considered by the Bureau).  In the Final Rule, the Bureau reaffirmed its decision to extend the compliance deadlines in the interest of fairness — i.e., to clarify deadlines and ensure uniformity of the same — and to afford the Bureau time to reconsider certain provisions of the Small Business Lending Rule.  *Id.* at 47516.

Extending the compliance deadlines was only the first step toward "resolving the status of the regulation."  AR at 427.  The Bureau took another step toward improving the Rule when it recently issued a notice of proposed rulemaking suggesting substantive changes.  Small Business Lending Under the Equal Credit Opportunity Act (Reg. B), 90 Fed. Reg. 50952 (Nov. 13, 2025).  Specifically, "[t]he Bureau is reconsidering coverage of certain credit transactions and financial

institutions; the small business definition; inclusion of certain data points and how others are collected; and the compliance date." *Id.*

Not content to allow the regulatory process to run its course, Plaintiffs filed their Complaint on July 23, 2025, against the Bureau and its Acting Director Russell Vought (Defendants or also collectively Bureau). Compl., ECF 1, July 23, 2025. In it, Plaintiffs raise four counts under the Administrative Procedure Act (APA): (i) Defendants have "unlawfully withheld or unreasonably delayed" agency action, in violation of 5 U.S.C. § 706(1), by refusing to collect, maintain, and publish data as required by § 1071, Compl. ¶¶ 111-14; (ii) Defendants have not acted in accordance with law and exceeded their statutory authority, in violation of 5 U.S.C. § 706(2)(A), (C), by purporting to relieve financial institutions of their obligation to comply with § 1071 and by failing publish data as required by the statute, Compl. ¶¶ 115-22; (iii) Defendants violated their obligation to provide notice and an opportunity for comment, under 5 U.S.C. § 706(2)(D), when the Bureau issued the Press Release and the IFR, Compl. ¶¶ 123-26; and (iv) Defendants acted in an arbitrary and capricious manner, in violation of 5 U.S.C. § 706(2)(A), when they issued the IFR and "adopt[ed] the[ ] policy of abdication," Compl. ¶¶ 134-37. Before the Bureau had even responded to the Complaint, Plaintiffs filed a motion for summary judgment. Pls.' Mot. for Summ. J. and Memo. in Support, Dkt. No. 14-1, Sept. 3, 2025.

Following the issuance of the Final Rule (extending the compliance deadlines) on October 2, 2025, Plaintiffs filed a Supplemental Complaint, Supp. Compl., Oct. 29, 2025, Dkt. No. 30, and revised summary judgment motion (Revised SJ Memo), October 29, 2025, Dkt. No. 31. The Supplemental Complaint adds three counts. Counts Five and Six are essentially identical to Counts One and Two, with the exception that Count Six adds references to the Final

Rule. *See* Suppl. Compl. ¶¶ 20-31. Count Seven is similar to Count Four, in focusing on alleged arbitrary and capricious conduct, but it too focuses on the Final Rule. *See* Suppl. Compl. ¶¶ 32-35. The revised summary judgment motion moves for summary judgment on all counts, though Plaintiffs never fulsomely address Count Four. *See* Revised SJ Memo. Of note, as relief—including on their claim that the Bureau unreasonably delayed agency action—Plaintiffs seek the vacatur of the Final Rule and the Press Release. *See* Revised SJ Memo. at 35.

### STANDARDS

If a court lacks subject matter jurisdiction, it should dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1). *See Jacksonville Urb. League, Inc. v. Azar*, No. 18-CV-2275 (DLF), 2019 WL 3208686, at *2 (D.D.C. July 16, 2019). Similarly, a court should dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) if the complaint fails to state a claim upon which relief can be granted. *See Wilson v. US Bank Nat'l Ass'n*, No. 22-CV-3584 (DLF), 2022 WL 22316423, at *1 (D.D.C. Dec. 10, 2022). In an Administrative Procedure Act case like this one, "summary judgment" in favor of the agency is warranted if the Court decides, "as a matter of law, [that] the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Landmark Hosp. of Salt Lake City v. Azar*, 442 F. Supp. 3d 327, 331 (D.D.C. 2020). Summary judgment under Federal Rule of Civil Procedure 56 in favor of Plaintiffs is unwarranted if jurisdiction is lacking, *see Alameda Cnty. Med. Ctr. v. Becerra*, No. 23-CV-690 (APM), 2024 WL 3536620, at *1 (D.D.C. June 24, 2024), or if their complaint fails to state a claim upon which relief can be granted, *see Smith v. Reilly*, 671 F. Supp. 2d 123, 126 (D.D.C. 2009).

## ARGUMENTS

### I.    Plaintiffs' Claims Should Be Dismissed for Lack of Standing As They Cannot Satisfy Article III's Traceability and Redressability Requirements

Absent jurisdiction, there is nothing for a court to do but dismiss a case.  Jurisdiction is absent here:  Plaintiffs have not alleged, much less demonstrated as they must at the summary judgment stage, that they have been harmed by the Bureau's actions at issue in this case (*i.e.*, the Final Rule, the Press Release, and the like, *see* Compl. and Supp. Compl.) as opposed to actions outside the scope of this litigation — *i.e.*, the broadly applicable stays of the regulatory compliance deadlines entered by three other federal courts.  Plaintiffs, then, have failed to satisfy both the traceability and redressability elements of the familiar test for Article III standing.  And there is nothing for the Court to do but dismiss the case.

Federal courts play an important but limited role in our system of government; they decide only "cases" and "controversies," Art. III, § 2, lacking a "a roving commission to publicly opine on every legal question."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  Standing is an "essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  "To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  *Columbia Gulf Transmission, LLC v. FERC*, 106 F.4th 1220, 1228 (D.C. Cir. 2024) (quotation marks omitted).  Causation and redressability are commonly "flip sides of the same coin."  *Sprint Commc'ns Co. v. APCC Services, Inc.*, 554 U.S. 269, 288 (2008).  "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).  But "[a]n injury will not be fairly traceable to the defendant's challenged conduct nor redressable where the injury depends not only on that [challenged] conduct, but on

14

independent intervening or additional causal factors." *Fulani v. Brady*, 935 F.2d 1324, 1329 (D.C. Cir. 1991).

At the summary judgment stage of the proceedings, Plaintiffs "can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts [establishing standing] which for purposes of the summary judgment motion will be taken to be true." *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015) (cleaned up). And the D.C. Circuit has held that plaintiffs have failed to establish standing to sue when there were other causes of their alleged injuries. *See Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, 909 F.3d 446, 465 (D.C. Cir. 2018) (concluding that plaintiffs failed to demonstrate standing to challenge an agency directive when a separate federal statute "prohibit[ed] all the same conduct as the [d]irective"); *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1296-97 (D.C. Cir. 2015) (holding that plaintiffs failed to establish standing to challenge a regulation when another agency had a "substantially identical" regulation in effect).

Plaintiffs have not adequately established that any harm they've suffered is traceable to the conduct challenged in this litigation. To be sure, Plaintiffs allege that, as a general matter, the lack of § 1071 data is harmful to them. *See, e.g.*, Compl. ¶ 12 ("The absence of data impedes the ability of small businesses, including farms and businesses owned by women or minorities, to obtain financing, significantly harming their prospects for success."); Supp. Compl. ¶ 19 ("Because the 2025 Final Rule confirms the 2025 IFR and Press Release, it harms Plaintiffs in the same ways explained in the Complaint."). And they make similar statements in their declarations. *See, e.g.*, Declaration of Paulina Gonzalez-Brito, Chief Executive Officer of Rise Economy, Aug. 21, 2025, ECF Dkt. 31-3, ¶ 16 ("Without Section 1071 data, Rise Economy and its members are unable to effectively raise discrimination concerns and claims related to business

lending practices with lenders and regulators.")  But they never allege, much less demonstrate in a manner sufficient to satisfy summary judgment, that they are harmed by any absence of data caused by the actions at issue in this case (*i.e.*, the Final Rule, the Press Release, and the like), as opposed to any absence of § 1071 data attributable to the broad stays of the regulatory compliance deadlines issued by the courts in the Texas, Kentucky, and Florida cases. Order, *Texas Bankers Ass'n v. CFPB*, No. 24-40705 (5th Cir. Feb. 7, 2025), Dkt. No. 134-2, (tolling compliance deadlines pending further order); Order, *Monticello Banking Co. v. CFPB*, No. 6:23-cv-00148-KKC, (E.D. Ky. Mar. 11, 2025), Dkt. No. 48 (same); Resp. to Mot. to Stay, *Revenue Based Finance Coalition v. CFPB*, 1:23-cv-24882 (S.D. Fla. May 6, 2025), Dkt. No. 81 (entering stay of compliance deadlines for length of Fifth Circuit stay).  These stays are quite broad.  The stay in the Texas case alone applies to, among others, all members of the American Bankers Association (ABA), all members of the Texas Bankers Association (TBA), and all members of America's Credit Unions—the largest banking trade association in the United States, the largest state banking organization in the United States, and the largest association of credit unions in the United States, respectively.[8]  And the stays in the Florida and Kentucky cases only add to the number of entities that have an independent basis for declining to collect and submit § 1071 data at this point.  Given the breadth of these stays, does a delay in the receipt of data from entities not covered by the stays cause cognizable harm to Plaintiffs?  Plaintiffs never show that it does.

---

[8] *See, e..g.*, Kalyani Munshani, *Security Concern or Economic Motivations? The Regulation of Informal Value Transfer Systems*, 12 Or. Rev. Int'l L. 77, 84 (2010) (noting the size of the ABA); *TBA v. CFPB*, 7:23-cv-144 (S.D. Tex.), First Am. Compl. ECF 12, ¶17 (discussing the TBA); *TBA*, 7:23-cv-144, Motion to Intervene, ECF No. 32 (motion to intervene by Credit Union National Association, which has become America's Credit Unions, https://www.cuna.org/about.html); *TBA*, 7:23-cv-144, Order, ECF No. 34 (granting intervention to credit unions).

A blog post cited in Plaintiffs' complaint highlights their problem. Plaintiffs, in an effort to demonstrate that the Press Release is final agency action, point out that America's Credit Unions put up a blog post entitled, "The Sweet Escape: CFPB Won't Prioritize Enforcement of Section 1071." Compl. ¶ 63. But Plaintiffs don't mention a key point at the end of the post: "America's Credit Unions' members are already covered by the stay and not directly affected by the CFPB's announcement." America's Credit Unions, Blog Post, accessible at Compl. ¶ 63, n.71. That is, for the members of America's Credit Unions—as for the members of so many other organizations covered by the stays—the actions at issue in this litigation will have no effect: any obligation these banks, credit unions, and other creditors have with respect to § 1071 is governed by the stays, not the actions at issue in this case.

To use the language of standing, there are potentially "independent intervening or additional causal factors," *Fulani*, 935 F.2d at 1329, causing Plaintiffs harm — namely, the stays issued by other federal courts. And Plaintiffs have not adequately demonstrated that the harm they complain about is caused by Bureau's actions challenged in the complaint, as opposed to these stays. Thus, they have not satisfied the traceability element of standing.

Plaintiffs come up short as to redressability as well. That's no surprise given that traceability and redressability are commonly "flip sides of the same coin." *Sprint Commc'ns Co.*, 554 U.S. at 288. Plaintiffs do not seek — and could not secure — an order from this court disturbing the stays issued by the other courts. Regardless of what this Court does, then, those orders will stay in place. Accordingly, Plaintiffs haven't adequately demonstrated that a favorable ruling in this case will redress their harm.

Dismissal for want of jurisdiction is appropriate.

17

## II.    Plaintiffs' Claim That Defendants Acted Arbitrarily and Capriciously When Enacting the Final Rule Is Meritless

On the merits, we start where Plaintiffs end — with the claim that the Final Rule is arbitrary and capricious under 5 U.S.C. § 706(2)(A) because "[n]either [Defendants'] affirmative justification nor their response to comments is facially reasonable nor supportive of their predetermined delay."  Revised SJ Mem. at 37.  This is the heart of their case.  Notwithstanding all of the ink that Plaintiffs spill on inaction, their gripe is not really that the agency has failed to act, it's that the agency has acted—in extending the compliance deadlines—in a way that they think is unreasonable.  Indeed, as pointed out earlier, that's why they seek vacatur of various agency actions — not an order to take an untaken action — as a remedy for their § 706(1) claim.  And this arbitrary and capricious argument, their central argument, falls flat.  The Bureau reasonably (i) explained its rationale for a relatively short postponement of the compliance deadline and (ii) responded to comments.  At bottom, it was rational for the Bureau to extend compliance deadlines for entities that had not benefitted from the broad stays issued in the other ongoing federal cases.  Thus, the Bureau satisfied the relatively undemanding arbitrary and capricious standard.  The Court should, therefore, deny Plaintiffs' motion for summary judgment on Count Seven and, more than that, should dismiss the complaints for failure to state a claim or enter summary judgment in favor of the Bureau.

At the outset, it's important to remember the APA's arbitrary and capricious standard is not intended to allow courts to second-guess agency decisions.  *See Pub. Emps. for Env't Resp. v. Beaudreau*, 25 F. Supp. 3d 67, 112 (D.D.C. 2014).  To that end, the arbitrary and capricious standard is a deferential one, *Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015), under which the "scope of review  . . . is narrow and a court is not to substitute its judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Under this standard, so far as is relevant to

Plaintiffs' arguments, a rule is arbitrary and capricious if it is not reasonably explained, *Carlson v. Postal Regulatory Commission*, 938 F.3d 337, 343 (D.C. Cir. 2019), "*entirely fail[s]* to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (emphasis added), or "offer[s] an explanation for its decision that runs counter to the evidence before the agency," *id*. at 43. In addition, "[a] regulation will be deemed arbitrary and capricious, if the issuing agency failed to address *significant comments* raised during the rulemaking," though "[a]n agency's obligation to respond . . . is not particularly demanding." *Ass'n of Priv. Sector Colleges & Univ. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012) (emphasis added) (internal quotations omitted).

Plaintiffs first contend that the Bureau's reasons for the final rule are irrational. Revised SJ Memo. at 37. Not so. Plaintiffs correctly identify the Bureau's basic rationales for delaying the compliance dates, namely, its interests in (1) eliminating confusion and creating uniform compliance deadlines (given that some entities had obtained postponements of the deadlines through litigation), and (2) giving the "CFPB time to consider the feedback it has received from stakeholders since the publication of the 2023 final rule and time to reconsider certain of its provisions," 90 Fed. Reg. 47516. Revised SJ Memo. at 37. Plaintiffs err, however, in contending that these commonsense conclusions are irrational.

On the confusion point, Plaintiffs insist that the Bureau never explains what the confusion is and that, at all events, any confusion is the product of the Bureau's own actions. Revised SJ Memo. at 37-38. They're wrong on both counts. The relevant confusion is confusion about whether an entity is subject to the 2024 rule setting the deadlines for the Small Business Lending Rule or not, because of the multiple cases in which entities—including membership organizations—obtained stays of the compliance deadlines. Indeed, there is no definitive guide

19

of the membership to all of these groups, so Defendants don't know who is a member—and, in fact, the membership may be fluid. And, contrary to Plaintiffs' assertion, the Bureau explained this in the preamble to the Final Rule, noting that the interim final rule, and by extension the Final Rule, "eliminate confusion by providing consistent dates for all financial institutions, whether or not they are plaintiffs or intervenors in litigation." 90 Fed. Reg. 47517.

Plaintiffs fare no better in asserting that any confusion was created by the Bureau. Revised SJ Memo. at 38. The confusion was created by the stays issued by multiple federal courts—not the Bureau. Of course, this is not to say that the stays themselves were confusing, or otherwise inappropriate, only that the existence of orders from multiple federal courts staying the compliance deadlines for many entities subject to the Small Business Lending Rule, including for unknown members of several large members associations, naturally created uncertainty about regulated entities' compliance obligations (*e.g.*, because the Bureau cannot easily tell who is a member and, moreover, not all members of the associational plaintiffs who obtained relief may understand that relief granted to the associations runs to the members). Plaintiffs raise the same it's-the-Bureau's-fault argument with respect to the uniform compliance rationale, and it fails for the same reason: It ignores the fact that, in the other cases, federal judges—not the Bureau— decided to extend the compliance deadlines. To the extent Plaintiffs object to the Bureau's litigation decisions in those other cases, the objection fails, because litigation decisions are not reviewable under the APA. *See, e.g.*, *Am. Waterways Operators v. United States Coast Guard*, 613 F. Supp. 3d 475, 487 (D. Mass. 2020); *Didrickson v. U.S. Dep't of Interior*, 982 F.2d 1332 (9th Cir. 1992); *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). And the cases cited by Plaintiffs do not support a different conclusion: They involve courts holding agencies responsible for decisions made during the rulemaking process, not for decisions made by courts (or for separate

20

unreviewable actions taken by the agencies). *See, e.g.*, *Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 573 (2d Cir. 2015). Put otherwise, the cases are inapposite because there was nothing the Bureau could have done in this rulemaking to alter these court-issued stays.

Next, Plaintiffs challenge the Bureau's conclusion that a stay of compliance deadlines will allow it to "consider the feedback it has received from stakeholders since the publication of the 2023 final rule and time to reconsider certain of its provisions." 90 Fed. Reg. 47516. They assert that the Bureau cannot satisfy the requirement in *F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009), that an agency changing a policy (here, the date for compliance) must "show that there are good reasons for the new policy," 556 U.S. at 515, because the concerns being considered are "not new" and were considered prior to the publication of the 2023 Rule. Revised SJ Memo. at 39. Plaintiffs misunderstand *Fox*. The bases for an agency's decision need not be new to meet *Fox*'s "good reason" standard. Indeed, the D.C. Circuit has said as much: "[The agency] did not rely on new facts, but rather on a reevaluation of which policy would be better in light of the facts . . . *Fox* makes clear that this kind of reevaluation is well within an agency's discretion." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012). Thus, it is reasonable for the Bureau to consider lingering concerns about the Small Business Lending Rule, even if those concerns are not new. Moreover, the agency leaders who previously evaluated these concerns are not the same leaders evaluating them now. And there is nothing untoward about the Bureau's new leadership evaluating concerns about the 2023 Rule on the basis of their policy priorities. "A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *Id.* at 1043 (quotation marks omitted).

Plaintiffs then turn to the Bureau's response to the comments it received.  They first assert that the Bureau did not provide the "more detailed justification" required by *Fox*, 556 U.S. at 515, when serious reliance interests, like those allegedly revealed in some of the comments, are at stake.  Revised SJ Memo. at 39-40.  It's true that an agency, when changing a policy, must provide a "more detailed justification than what would suffice for a new policy created on a blank slate . . . when its prior policy has engendered serious reliance interests."  *Fox*, 556 U.S. at 515.  But Plaintiffs misstep by contending that the heightened standard applies here, as no "serious reliance interests" could develop in the short timeframe at issue.  *See FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 585 (2025).

In support of the contention that serious reliance interests existed, Plaintiffs point to two associations that submitted comments contending that their members made investment decisions based on where the compliance deadlines stood prior to the IFR.[9]  Revised SJ Memo. at 39-40; *see* AR at 759, 855.  But those prior deadlines were set in a rule published on July 3, 2024, Small Business Lending Under the Equal Credit Opportunity Act (Reg. B); Extension of Compliance Deadlines, 89 Fed. Reg. 55024 (July 3, 2024), less than a year before the IFR was published, on June 18, 2025.  Less than one year does not suffice to develop the sort of "serious reliance interests" referred to in *Fox*, as established by the Supreme Court's recent decision in *Wages & White Lion Investments*, 604 U.S. at 585.  In *Wages & White Lion Investments*, while addressing an argument that serious reliance interests had grown up over a similar year-long period (actually, a slightly longer one), the Court explained, "[o]ur prior change-in-position cases

---

[9] The cited associations' related concern that their members will suffer a competitive harm because other institutions who did not invest in compliance will be rewarded for their delayed efforts is really an objection to the judicial stays, not the Bureau's IFR or Final Rule.  The Bureau's actions to extend the compliance dates benefit competition by ensuring that similarly situated institutions are subject to the same deadlines.

have set a much higher bar, requiring, for example, 'decades of industry reliance on an agency's prior policy." *Id.* The same logic applies here, and Plaintiffs' argument fails.

Plaintiffs' next argument is that the Bureau did not adequately address the harm caused by "postponing the benefits" of the Small Business Lending Rule. *Id.* at 40. This argument also comes up short. While the agency has a duty to respond to significant comments, "[t]here is no requirement, however, that an agency respond to significant comments in a manner that satisfies the commenter. Instead, to respond adequately, the agency must only address significant comments in a reasoned manner." *Reytblatt v. Nuclear Regulatory Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997) (quotation marks omitted). The Bureau responded to comments about postponing the benefits of the Small Business Lending Rule in a reasoned manner, explaining that "while this final rule reaffirms delays in the collection of small business lending data, the delays for certain data would have occurred anyway as to some institutions because of the still outstanding litigation" and that the Bureau "believes that the resolution of this uncertainty and addressing the underlying concerns raised by stakeholders about the 2023 final rule will, in the longer term, result in better data collection." 90 Fed. Reg. 47517. While this is not the conclusion Plaintiffs would have reached, there is nothing irrational about the conclusion that delaying the compliance deadlines was the proper course, notwithstanding the potential harm, given the upsides of doing so (in terms of clarity and uniformity)—especially as the data collection already would be delayed as to many entities due to the litigation-based extensions.

Plaintiffs' last comment-based argument is that the Bureau ignored a comment noting that a rule implementing the analogous data collection requirement in the Home Mortgage Disclosure Act, 12 U.S.C. § 2801, *et seq.*, was implemented in a shorter time and carried significant benefits for borrowers and lenders, *id.* at 40-41; *see* AR at 778-79. This argument is flawed. The Bureau

is obligated to respond to significant comments, which are comments that "raise points relevant to the agency's decision and . . . if adopted, would require a change in an agency's proposed rule." *City of Portland, Oregon v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007). Under this standard, however, the HMDA-related comments are *in*significant because they would not require a change in the Final Rule. That the HMDA data-collection rule may have been published relatively quickly says nothing about whether the Bureau appropriately postponed the compliance dates to account for circumstances related to *this rule* (where many entities already benefited from court-ordered postponements). Similarly, that the HMDA data collection rule benefited borrowers and lenders is insignificant: The HMDA rule is a different rule, and in any case, the Bureau has not disputed that the data collection rule will benefit borrowers and lenders alike, *see, e.g.*, IFR, 90 Fed. Reg. 25879.

Two arguments anchor the end of Plaintiffs' arbitrary and capricious section, and each can be dispatched quickly. The first argument is that "the delay will necessarily be more than one year" because of the time needed to modify the Small Business Lending Rule (as the Bureau has suggested it will), "rendering Defendants' analysis fatally inaccurate." Revised SJ Memo. at 41. But that future changes to the substance of the Small Business Lending Rule (like those proposed in the NPRM) may support the need for future compliance date extensions does not mean that more than the roughly 350-day extension finalized by the Final Rule is not warranted now, based on the circumstances before the Bureau when it issued the Final Rule. The second argument is that "this section's points apply with even greater force to the 2025 IFR and Press Release," which "contain even less explanation." Revised SJ Memo., at 41. Although contained in Plaintiffs' discussion of Count Seven, this argument relates to Count IV, which addresses the

24

IFR and the Press Release.  *See* Compl. ¶¶ 134-37.  We address the flaws in this argument in the section addressing Count IV.  See Section VI below.

### III.    The Claim That the Bureau Unlawfully Withheld or Unreasonably Delayed Agency Action Fails:  This is a Case About Action, Not Inaction, and, in Any Case, There Was No Unreasonable Delay

Plaintiffs allege, in both their Complaint (Count One) and Supplemental Complaint (Count Five), that the Bureau has violated the APA's prohibition on unlawfully withholding or unreasonably delaying agency action, 5 U.S.C. § 706(1), by "refusing to collect, maintain, and publish data as required by Section 1071[.]"  Compl. ¶ 114, Supp. Comp. ¶¶ 22-23.  Section 1071 provides, in relevant part, that "[t]he data required to be compiled and maintained under this section by any financial institution shall be submitted annually to the Bureau" and "annually made available to the public generally by the Bureau."  15 U.S.C. § 1691c-2(f)(1), (2)(C).  Plaintiffs seek summary judgment on this claim.  Revised SJ Memo. at 30-35.

The Court should dismiss this claim or, in the alternative, enter judgment in favor of the Bureau.  Importantly, Plaintiffs do not allege—nor could they—that the Bureau has failed to discharge its duty under the statute to issue a rule implementing § 1071.  *See* 15 U.S.C. § 1691c-2(g)(1).  Indeed, the Small Business Lending Rule discharges that duty.  Instead, they allege that the Bureau has failed to discharge alleged independent duties to collect, maintain, and publish data on a timetable desired by Plaintiff.  This alleged failure is not actionable.  But even if it were, the Bureau has not impermissibly withheld or delayed action under the governing precedent.  *See, e.g.*, *Telecom. Rsch. & Action Ctr. (TRAC) v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984).  Finally, Plaintiffs' request for vacatur of the Final Rule, IFR, and the Press Release are ill-founded, as vacatur is not available for a § 706(1) claim.  To sound a familiar theme, Plaintiffs' inability to make out a failure to act claim is unsurprising, because Plaintiffs' real objection is not that the Bureau has failed to take any discrete agency action (let alone one that

25

was required by statute), but rather that it took a final agency action—delaying the compliance date—that Plaintiffs disagree with.  The Court should dismiss Counts One and Five or enter judgment in favor of the Bureau on those Counts.

A.   Plaintiffs Have Not Identified a Required, Discrete Agency Action

Section 706(1) empowers courts to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  At least three conditions must be met for a failure to act to be challengeable under § 706(1).  First, the action must be one the agency is legally required to take.  *Norton v. S. Utah Wilderness All.* (*SUWA*), 542 U.S. 55, 64 (2004).  Second, the action must be an "agency action"—that is, it must be a "determination of rights and obligations . . . by way of a 'rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.'"  *Am. Forest Res. Council v. United States*, 77 F.4th 787, 804 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 1110, 218 L. Ed. 2d 348 (2024) (quoting 5 U.S.C. § 551(13)).  Third, the action must be "discrete."  *SUWA*, 542 U.S. at 62; *Am. Forest Res. Council*, 77 F.4th at 804.  "[O]nly an act or 'failure to act' with 'the same characteristic of discreteness'" as the five "'circumscribed' and 'discrete'" "categories of action listed in the APA's definition—rule, order, license, sanction and relief"—"is reviewable under the APA." *Am. Forest Res. Council*, 77 F.4th at 804 (quoting *SUWA*, 542 U.S. at 62, 63).

Plaintiffs here have no actionable § 706(1) claim.  To start, Plaintiffs' § 706(1) claim fails because Plaintiffs have not identified an untaken action that the Bureau has a duty to perform.  *See W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1241 (D.C. Cir. 2018) (holding the "only action a court may compel an agency to take under § 706(1) is discrete action that the agency has a duty to perform").  Plaintiffs allege that the Bureau has "refus[ed] to collect, maintain, and publish data as required by Section 1071."  Compl. ¶ 114.  This allegation is

flawed, however, because it rests on a misreading of § 1071.  Section 1071 requires financial institutions (not the Bureau) to "compile and maintain" data "in accordance with regulations of the Bureau" and then to submit that data "annually to the Bureau." 15 U.S.C. § 1691c-2(e)(1), (f)(1).  In turn, the "[i]nformation compiled and maintained" by financial institutions "shall be . . . annually made available to the public generally by the Bureau."  *Id.* § 1691c-2(f)(2).  Thus, the Bureau has no freestanding statutory duty to "collect" or "maintain" data.  Instead, under the statute, financial institutions have an obligation to "compile," "maintain," and "submit[ ]" data to the Bureau under the terms of the implementing rule.  And while the Bureau is required to make available to the public the information that financial institutions compile, maintain, and submit, 15 U.S.C. § 1691c-2(f)(2), no such information has been submitted, so there is presently no information to be published.  Accordingly, as there is no action the Bureau is currently required to take, there is nothing the Court could order it to perform under § 706(1).

Plaintiffs § 706(1) claim also fails because it does not involve "agency action."  As the D.C. Circuit explained in *American Forest Resource Council*, inaction is challengeable only if the allegedly withheld or delayed action is "an 'agency action'—that is, an action involving the determination of rights and obligations."  *Am. Forest Res. Council*, 77 F.4th at 804.  But—even if Plaintiffs correctly identified the Bureau's obligations under the statute, which they haven't (see above)—"collect[ing], maintain[ing], and publish[ing] data," Compl. ¶ 114, does not determine anyone's rights or obligations.  Collecting data is not like issuing a rule or an order.  *See Am. Forest Res. Council*, 77 F.4th at 804; 5 U.S.C. § 551(13).  Publishing data is not like issuing (or refusing to issue) a license.  *See Am. Forest Res. Council*, 77 F.4th at 804; 5 U.S.C. § 551(13).  Whether the § 1071 data is collected or published does not affect what Plaintiffs are legally permitted, or obligated, to do.

Finally, even assuming that Plaintiffs have identified a required "agency action" that the Bureau has not taken, Plaintiffs' § 706(1) claim would still fail because the action they seek is not discrete. *See Am. Forest Res. Council*, 77 F.4th at 805. Plaintiffs don't allege that the Bureau failed to collect a specific institution's data for a specific period, or that it failed to publish the same. Compl. ¶ 114. Instead, Plaintiffs allege that, to date, the Bureau has improperly declined to collect, retain, or publish data at all. *Id.* This is, in other words, a claim that the Bureau has generally failed to "compl[y] with broad statutory mandates." *SUWA*, 542 U.S. at 66. But "[g]eneral 'deficiencies in compliance' . . . 'lack the specificity requisite for agency action.'" *Id.* Multiple D.C. Circuit decisions have rejected claims for a lack of discreteness in analogous circumstances. *See, e.g.*, *Am. Forest Res. Council*, 77 F.4th at 805 (concluding "plaintiffs' requested relief is targeted at the continuing ... operations of the BLM—years' worth of policy choices and site-specific decisions—rather than some particular agency action.") (quotation marks omitted); *Montanans For Multiple Use v. Barbouletos*, 568 F.3d 225, 227 (D.C. Cir. 2009) (concluding that plaintiffs' contention that "the Forest Service neglected its general statutory and regulatory obligations to manage the forest so as to provide for multiple uses and a sustained yield of resources . . . amount[ed] to nothing more than allegations of general deficiencies in compliance that lack the specificity requisite for agency action"); *see also Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 27 (D.D.C. 2017) ("But it is clear to this Court that the regulatory language that CBD seeks to enforce in this lawsuit—which, again, provides that 'agencies shall continue to review their policies and procedures and in consultation with the CEQ to revise them as necessary to ensure full compliance with the purposes and provisions of NEPA,' 40 C.F.R. § 1507.3(a)—prescribes only an agency's general mode of operations, not any discrete agency action, and thus cannot be the basis for a valid § 706(1) claim.") (cleaned up).

Dismissal, or summary judgment in favor of the Bureau, is warranted.

B.  The *TRAC* Factors Do Not Support Plaintiffs' § 706(1) Claim

To determine whether an agency's delay in taking a required action is unreasonable, courts in this circuit apply the six-factor test set out by the D.C. Circuit in *TRAC*, 750 at 80.  The *TRAC* test consists of "six considerations that, although neither ironclad nor exhaustive, still provide useful guidance."  *Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807, 815 (D.C. Cir. 2024) (quotation marks omitted).  These are the six considerations:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Afghan & Iraqi Allies*, 103 F.4th at 815 (quoting and cleaning up *TRAC*, 750 F.2d at 80).

Contrary to Plaintiffs' suggestion, this is not like a case in which an agency failed to act in response to a judicial decision that rendered a mandatory rule unenforceable.  Revised SJ Memo. at 31-32.  Instead, the Bureau has responded to the judicial stays of the Small Business Lending Rule with final agency actions: first the IFR and now a new Final Rule.  So, if there is a problem (there isn't), it is one of action—the delaying of the compliance deadlines—not of inaction.

Nevertheless, even assuming that *TRAC* provides the appropriate standard for evaluating the Bureau's decision to delay the Small Business Lending Rule's compliance dates, the *TRAC*

factors support the Bureau's position.  First, the Bureau's decision is "governed by a rule of reason."[10]  *TRAC*, 750 F.2d at 80.  To wit, the Bureau has delayed the compliance dates for the 2023 Rule (i.e., the dates on which financial institutions must begin collecting data for submission to the Bureau) by less than a year to (1) eliminate confusion and create uniform compliance deadlines (given that some entities had obtained postponements of the deadlines through litigation) and (2) afford the Bureau time "to issue a new proposal to reconsider certain aspects of the 2023 final rule."  90 Fed. Reg. 47516.  This concern with fairness and equality is an eminently reasonable basis for the Bureau's decision to postpone compliance.  *Cf. Ohio v. EPA*, 603 U.S. 279, 292 (2024) (recognizing that being forced to comply with regulation as to which competitors have obtained a stay can create a competitive disadvantage for the party that must comply).  Similarly, as noted earlier:  "A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations."  *Nat'l Ass'n of Home Builders*, 682 F.3d at 1043 (quotation marks omitted).

    And while Plaintiffs emphasize the overall number of years since § 1071 became law, *see* Revised SJ Memo. at 31, there is no per se rule regarding how quickly agency action must take place.  The issue of how long is too long "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful."  *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003); *see also see Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 476 (D.C. Cir. 1998) (holding no remedy warranted under § 706(1) where Congress required agency to promulgate regulations

---

[10] Plaintiffs understandably do not address the related second factor, because Congress did not provide a timetable or other indication for when the allegedly withheld actions should occur. Revised SJ Memo. at 32.

within 120 days and regulations were not issued for ten years).  In the circumstances of this case — *i.e.*, given the interests in providing for even-handed enforcement, ensuring that the regulation is aligned with the Bureau's priorities, and accounting for the complexity of the subject matter — the Bureau has acted reasonably.

Next up is "TRAC's third factor ... [which] overlaps with the fifth," *In re Barr Laby's., Inc.*, 930 F.2d 72, 75–76 (D.C. Cir. 1991), and which "courts [therefore] tend to analyze [ ] together," *Dahl v. Dickson*, No. 19-cv-3267 (ABJ), 2020 WL 6887925, at *6 (D.D.C. Nov. 24, 2020). These considerations focus on what's at stake, and they also support the Bureau's actions. Recall the Court of Appeals has stated that "[d]elays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake." *Afghan & Iraqi Allies*, 103 F.4th at 815.  Plaintiffs don't deny that this case involves economic regulation. Revised SJ Memo. at 31.  But they nonetheless contend that this case "is one where human welfare is at stake," *id.* (cleaned up), because the § 1071 data could be used to combat discrimination and "discrimination goes to the heart of human welfare," *id.* at 32.  Plaintiffs' argument is unconvincing.  The D.C. Circuit has distinguished economic regulations from regulations involving health and welfare (for an example of the latter, *see, e.g.*, *In re International Chem. Workers Union*, 958 F.2d 1144, 1150 (D.C. Cir. 1992) (obligating OSHA to follow a schedule given the "admittedly serious health risks associated with the current permissible levels of cadmium exposure")), and Plaintiffs can't rewrite the D.C. Circuit precedent to eliminate that distinction.  This is not to say that preventing discrimination is unimportant — it's undoubtedly important.  But not everything that's important is treated as a matter of health and welfare in this analysis.  *See Fed. Election Comm'n v. Rose*, 806 F.2d 1081, 1091 (D.C. Cir. 1986) (concluding, in a case involving election law violations, that

"notwithstanding the obvious importance of the political process, this is not a case in which human health and welfare are at stake, and in which agency delay is least tolerable").  The Small Business Lending Rule — focused as it is on the lending practices of financial institutions — is a paradigmatic economic regulation, and delays in this sphere are more "tolerable" than in others.[11]

Finally, Plaintiffs contend that the sixth factor — whether "impropriety" is involved in the delay — weighs in their favor, arguing that "[w]hen an agency and its leadership seek to obliterate a congressionally created agency, their subsidiary efforts to thwart individual statutory mandates should be viewed with considerable skepticism."  Revised SJ Memo. at 35.  Plaintiffs' contention is off the mark because there's no evidence of impropriety in the delay.  To the contrary, the circumstances demonstrate otherwise:  The Bureau has acted expeditiously to propose revisions of and improvements for the Small Business Lending Rule.  Thus, Plaintiffs have no real argument in support of impropriety, much less one that overcomes the presumption of regularity that attaches to the Bureau's actions.  *See, e.g., People for the Ethical Treatment of Animals v. United States Dep't of Agric. & Animal & Plant Health Inspection Serv.*, 918 F.3d 151, 157 (D.C. Cir. 2019) ("A presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.") (quotation marks omitted from parenthetical).  This factor does not favor Plaintiffs.

---

[11] The fourth factor invites courts to consider "the effect of expediting delayed action on agency activities of a higher or competing priority."  *TRAC*, 750 F.2d at 80.  The Bureau does not rely on this factor.

Taken as a whole, particularly in light of the rationality of the Bureau's actions, the *TRAC* factors support the Bureau's position. Thus, the Court should dismiss Plaintiffs' § 706(1) claim or enter judgment in favor of Defendants on this basis as well.

C. Vacatur is Not Available for § 706(1) Claims

There is one more problem with Plaintiffs' § 706(1) claim: it seeks vacatur, a remedy not available under § 706(1).  In Plaintiffs' revised summary judgment brief, they explain that, as relief for their § 706(1) claim, they are asking the Court to "compel compliance with Defendants' statutory mandate by vacating the actions [i.e., the Final Rule, IFR, and Press Release] through which they seek to evade it."  Revised SJ Memo. at 35; *see also id*. at 43.  But § 706(1) makes no reference to setting aside agency action (i.e., vacatur), as § 706(2) does.  *See* 5 U.S.C. § 706(2) (granting courts the power to "hold unlawful and set aside agency action, findings, and conclusions" in certain circumstances).  Rather, as noted earlier, § 706(1) provides that a court can "compel agency action unlawfully withheld or unreasonably delayed."

Yet, with respect to the Final Rule, IFR, and Press Release, Plaintiffs do not seek to compel the Bureau to take a withheld action.  The Bureau has acted — it has issued the Final Rule, IFR, and Press Release (and, now, the NPRM).  Plaintiffs, instead, want the Court to vacate the Final Rule, IFR, and Press Release because they disagree with what they say.  They don't like the Final Rule (and IFR's) postponement of the compliance deadlines.  Compl. ¶¶ 66-67.  And they disagree with the Bureau's intention, reflected in the Press Release, to deprioritize the enforcement of § 1071 against entities outside the court-issued stays.  *Id.* ¶¶61-62.  But § 706(1) claims are designed to make an agency act, not to set aside actions it has already taken.  Indeed, the D.C. Circuit has said as much.  *See, e.g., Pub. Citizen v. Nuclear Regul. Comm'n*, 845 F.2d 1105, 1108 (D.C. Cir. 1988) (explaining that "petitioners' [§ 706(1)] theory . . .  has no

application here" because "[t]he agency has acted"— "Petitioners just do not like what the Commission did"); *Ry. Lab. Executives' Ass'n v. U.S. R.R. Ret. Bd*., 842 F.2d 466, 475 (D.C. Cir. 1988) (holding that "the Association does not seek to compel agency action unreasonably withheld; rather, it is seeking to modify final action already taken by the Board" and that, for this reason § 706(1) "is not directly apposite").

Put simply, Plaintiffs' request for vacatur runs headlong into § 706(1)'s text, which does not permit the Court to set aside agency actions already undertaken.

### IV.   Counts Two and Six Fail:  There Is No Viable Claim That the Bureau, in Issuing the Final Rule, IFR, or Press Release, Acted Contrary to Law or Exceeded Its Statutory Authority

Plaintiffs argue (and allege) that the IFR, Final Rule, and Press Release violate the APA's prohibition on agency action contrary to law or in excess of statutory authority by improperly "purport[ing] to relieve lenders of th[e] legal obligation" to "compile, maintain, and submit Section 1071 data in accordance with the Lending Transparency Rule."  Revised SJ Memo. at 35; *see* Compl. ¶¶ 115-122; Supp. Compl. ¶¶ 24-31.  Their arguments come up short again. Threshold obstacles stand in the way of their arguments as to the IFR and the Press Release. And, in any case, none of the challenged documents (*i.e.*, the IFR, Final Rule, and Press Release) purport to alter any statutory requirement.

#### A.   The IFR-Related Statutory Authority Claim Is Moot

Plaintiffs' challenge to the IFR is moot.  When an agency issues a final rule addressing comments elicited by an interim final rule, the final rule supersedes the IFR and challenges to the IFR are moot.  *Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 472 (D.C. Cir. 2014) (noting principle); *Las Americas Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec*., 2025 WL 1403811, at *11 (D.D.C. May 9, 2025), reconsideration denied, 2025 WL 2105564 (D.D.C. July 28, 2025) (same).  That logic applies here.  After issuing the IFR, the Bureau issued

the Final Rule and, under the case law of this circuit, that mooted Plaintiffs' statutory authority

challenge to the IFR.

B.  <u>Plaintiffs' Statutory Authority Claim Lacks Merit As to the IFR and Final Rule
    Because the Bureau Has Not Purported to Excuse Entities from Their Statutory
    Obligation</u>

The statutory authority claims fall flat on the merits as to the Final Rule and the IFR.  It's

true that an agency cannot "alter [statutory] requirements and [ ] establish with the force of law

that otherwise-prohibited conduct will not violate the Act."  *Util. Air Regul. Grp. v. EPA,* 573

U.S. 302, 326 (2014).  As it happens, the Final Rule and IFR do no such thing.  One need look no

further than the text of the Rules themselves for proof.  The Final Rule, for example, states:

"The [Bureau] is finalizing its June 18, 2025 interim final rule amending Regulation B to extend

the compliance dates set forth in its 2023 small business lending rule, as amended by a 2024

interim final rule, and to make other date-related conforming adjustments."  90 Fed. Reg. 47514;

*see also* IFR, 90 Fed. Reg. 25875.  The Final Rule and IFR, then, make clear that they are

altering regulatory requirements (*i.e.*, previously established compliance deadlines)—not

statutory ones.  Indeed, the statute does not set compliance deadlines, and Plaintiffs never claim

otherwise.  (That's why they never make an argument under the second *TRAC* factor).  Instead,

they contend, without textual citation, that the Final Rule and IFR "exempt all financial

institutions from compliance with Section 1071."  Revised SJ Memo. at 36.  They do not—a fact

Plaintiffs tacitly admit in their Complaint.  In paragraph 69 of the Complaint, Plaintiffs write that

the "CFPB further made clear in the 2025 IFR that it plans 'to issue a new proposal to reconsider

certain aspects of the 2023 final rule,' leaving open the possibility that CFPB may seek to

prevent financial institutions from ever having to comply with Section 1071."  Plaintiffs, by

using words like "possibility" and "may," recognize that the Bureau has not issued any blanket

exemption; it is simply something they (misguidedly) speculate may happen.

35

This claim should be dismissed, and Plaintiffs' request for summary judgment should be denied.

   C.   Plaintiffs' Press Release-Related Statutory Authority Claim Should Be Rejected Because Plaintiffs Lack Standing, the Press Release is Not Final Agency Action, and the Claim Fails on the Merits

Plaintiffs' statutory authority claims regarding the Press Release fare no better.  First, Plaintiffs lack standing to challenge the Press Release because the IFR superseded it before Plaintiffs filed their first Complaint.  Second, the Press Release does not constitute final agency action challengeable under § 706(2).  Third, the claim fails on the merits:  The Press Release does not purport to alter any statute.

Plaintiffs lack any standing to challenge the Press Release.  *See, e.g., Columbia Gulf Transmission, LLC,* 106 F.4th at 1228 ("To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'").  By its terms, the Press Release states that "with respect to the regulation titled Small Business Lending Under the Equal Credit Opportunity Act," the Bureau "will not prioritize enforcement or supervision actions with regard to entities that are currently outside the stay imposed under *Texas Bankers Association v. CFPB*, No. 24-40705 (CA5)."  AR at 427.  But, following the issuance of the IFR, there was no enforcement to de-prioritize because the Bureau postponed the compliance deadlines to protect these very financial institutions (*i.e.*, the ones outside the stays).  IFR, 90 Fed. Reg. at 25875 (noting that "compliance dates have not been [judicially] stayed for those who are not plaintiffs or intervenors in th[e] cases" and "[t]o facilitate consistent compliance across all covered financial institutions, the CFPB is extending the compliance dates set forth in the 2024 interim final rule by approximately one year").  Thus, there is no harm traceable to the Press Release with respect to financial institutions that are not covered by the stays, depriving Plaintiffs of standing to

challenge the Press Release.  And even if standing were not lacking, the claim would be moot—because the post-complaint issuance of the Final Rule, which moved the compliance deadlines, would have eliminated any live controversy.  *See Samma v. Dep't of Def.*, 136 F.4th 1108, 1113 (D.C. Cir. 2025) ("A case is moot 'when the issues presented are no longer live[.]'") (quotation marks omitted from parenthetical).

But even if the Court finds standing, the claims fail because the Press Release was not final agency action.  To bring a claim under § 706(2), the challenged agency action must be "final agency action."  *Am. Anti-Vivisection Soc'y v. United States Dep't of Agric.*, 946 F.3d 615, 620 (D.C. Cir. 2020).  For an agency action to be considered final, it "must mark the consummation of the agency's decisionmaking process" and "the action must be one by which rights or obligations have been determined or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up).

The Press Release does not carry legal consequences.  Instead, it's a "non-binding action," a "policy statement [that] 'explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion.'"  *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015).[12]  Indeed, like the notice in *Huerta* that the D.C. Circuit deemed non-final, the Press Release "[did] not impose any

---

[12] Plaintiffs suggest, through a terse parenthetical statement, that *Edison Electric Institute v. EPA*, 996 F.2d 326 (D.C. Cir. 1993), stands for the principle that policy statements about enforcement priorities are necessarily final agency action.  Revised SJ Memo. at 30 (citing *Edison*, 996 F.3d at 331, 333, for the proposition that "agency statement that certain offenses will be 'reduced priorities, is reviewable").  But *Edison* stands for no such principle.  The D.C. Circuit's decision in *Florida Power & Light Company v. EPA,* 145 F.3d 1414, 1420 (D.C. Cir. 1998) demonstrates as much, as the court explained that "in *Edison Electric* . . . the court's decision that the policy statement at issue was reviewable hinged on a determination that the challenged statement effectively reopened a prior regulation and, thus, the challenge was really to the substance of the prior final regulation."  The Press Release does no such thing, however, and, as explained in the body of the brief, it is not otherwise final agency action.

obligation or prohibition on regulated entities" or "create a new basis for enforcement or liability." *Id.* at 717. Instead, the Press Release's statement that it "will not prioritize enforcement or supervision actions with regard to entities [outside the 5th Circuit stay]," AR at 427, fits "the archetypal aim of a policy statement: to apprise the public of the agency's intentions, and to inform the decisions of those who exercise the agency's discretion." *Huerta,* 785 F.3d at 717. And even if the Press Release made enforcement less likely, AR at 427, it did not prohibit enforcement: de-prioritizing enforcement is not the same as banning it. "An agency pronouncement is not deemed a binding regulation merely because it may have some substantive impact, as long as it leaves [the responsible agency decisionmaker] free to exercise his informed discretion." *Huerta*, 785 F.3d at 718; *see also id.* (explaining that even "if the Notice arguably inclines aviation safety inspectors towards certain outcomes when evaluating carry-on baggage programs, it does not constrain their discretion enough to create a binding norm"); *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*, 822 F.2d 1105, 1110 (D.C. Cir. 1987) (stating that policy statements can create rebuttable presumptions). Here, Bureau officials responsible for exercising the agency's supervisory and enforcement discretion were free to use that discretion when making supervisory and enforcement decisions, even if there was a thumb on the scale against enforcement. The Press Release was not final agency action.[13]

_____

[13] In arguing that the Press Release is final agency action, Plaintiffs rely on two internet sources that they admit are outside the administrative record. Revised SJ Memo. at 29 n.9. It is well established that, with limited exceptions, review of APA claims should be limited to the administrative record. *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981). Plaintiffs contend that the internet sources they cite are covered by an exception allowing the Court to take judicial notice of materials for the purpose of showing their effect on the reader. Revised SJ Memo. at 29 n.9. But "judicial notice is typically an inadequate mechanism for a court to consider extra-record evidence when reviewing an agency action" because "plaintiffs should not be permitted to exploit the standard for judicial notice to circumvent the strict standard for supplementing the administrative record." *Level the Playing Field v. FEC* 381 F.

Finally, the Press Release-related claims fail on the merits. Like the Final Rule and the IFR, the Press Release does not purport to alter statutory requirements. *See* Press Release; *Cf. Util. Air Regul. Grp.*, 573 U.S. at 326. To that end, it makes no mention of modifying a financial institution's compliance obligations. *See* AR at 427. Instead, the Press Release explained how the Bureau intended to exercise its enforcement discretion. *See id.* That the Bureau decided to de-prioritize enforcement is not the same things as eliminating an obligation to comply. *See Pub. Citizen Health Rsch. Grp. v. Acosta*, 363 F. Supp. 3d 1, 18–19 (D.D.C. 2018) (distinguishing an effort to change compliance obligations from the exercise of enforcement discretion).

Dismissal of the Press Release-related claim, or summary judgment in favor of Defendants, is warranted—summary judgment in favor of Plaintiffs is not.[14]

### V.    Plaintiffs' Notice-and Comment Count Is Moot (as to the IFR) and Is Not Justiciable and Without Merit (as to the Press Release).

Plaintiffs contend in Count Three of their complaint, on which they seek summary judgment, that the Bureau violated the APA when it issued both the IFR and the Press Release without notice and an opportunity for comment. Compl. ¶¶ 123-133.

This Count lacks merit. To start, The IFR claim was mooted by the issuance of the Final Rule. As the Supreme Court held in *Little Sisters of the Poor Saints Peter & Paul Home v.*

---

Supp. 3d 78, 92 (D.D.C. 2019), *aff'd*, 961 F.3d 462 (D.C. Cir. 2020) (cleaned up). In any case, Plaintiffs cannot rely on the hearsay exception for the effect of a statement on the listener because the effect that the statements of private parties on the internet had on their readerships is irrelevant. Indeed, as the America's Credit Unions blog post itself makes clear, the Press Release had no effect on the blog's intended readership, members of America's Credit Unions, who were already covered by a judicial stay.   .

[14] The complaint includes references to the Bureau's enactment of a "policy of abdicat[ion]" that violates the law and exceeds the Bureau's statutory authority. Compl. ¶ 118. The revised summary judgment brief includes only a few brief references to abdication. *See* Revised SJ Memo. at 2, 13. To the extent Plaintiffs intend to continue to press a claim about the alleged abdication policy, it fails. *See* § VI below.

*Pennsylvania*, 591 U.S. 657, 686 (2020), an interim final rule constitutes adequate notice to satisfy the notice-and-comment requirement with respect to a later-issued final rule.  Thus, Plaintiffs' notice-and-comment challenge to the IFR is mooted by the issuance of the superseding Final Rule.  *Ass'n of Am. Physicians & Surgeons*, 746 F.3d at 472; *Las Ams. Immigrant Advoc. Ctr.*, 2025 WL 1403811, at *1403811, at *11.

The notice-and-comment claim directed at the Press Release deserves the same fate.  As a threshold matter, Plaintiffs do not have standing to challenge the Press Release, which has been superseded by the IFR and the Final Rule.  See Section I above.  Also, as discussed earlier, the Press Release is not a final agency action.  See Section IV.C above.  The Bureau has no obligation to provide notice and an opportunity to comment as to non-final action.  *See Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1266 (D.C. Cir. 2018) (concluding that non-final agency action is not a reviewable action to which notice-and-comment requirement can attach); *Broadgate Inc. v. U.S. Citizenship & Immigr. Servs.*, 730 F. Supp. 2d 240, 247 (D.D.C. 2010) (holding that agency action did not constitute "final agency action subject to judicial review and the notice and comment requirements under the APA").

In any case, for the same reasons that it's not final agency action (*i.e.*, its lack of legal effect), the Press Release is not a legislative rule subject to § 553's notice and comment requirement.  *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (explaining that notice and comment requirements attach to legislative rules).  "Legislative rules are those that grant rights, impose obligations, produce other significant effects on private interests, or which effect a change in existing law or policy."  *Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013) (cleaned up).  The Press Release does not "grant rights, impose obligations, produce other significant effects on private interests, or effect a

40

change in existing law or policy." *Id*.  Instead, it is a "[a] policy statement 'explain[ing] how the agency will enforce a statute or regulation' . . . [which] [is] excepted from the requirements of notice and comment rulemaking." *Huerta*, 785 F.3d at 716.  Accordingly, the Court should dismiss or enter judgment in favor of Defendants.

## VI.  Defendants Should Prevail on Count Four Because the Policy of Abdication is Not Reviewable Under the APA and the IFR-Related Claims Are Moot

Plaintiffs contend, in Count Four, that Defendants violated the APA's prohibition on "arbitrary and capricious" agency action, 5 U.S.C. § 706(2)(A) "[i]n adopting their policy of abdication and promulgating the 2025 IFR" for numerous reasons, including because they "relied on factors that Congress did not intend them to consider, failed to consider important aspects of the problem Congress directed them to address, and disregarded facts and circumstances that underlay the Lending Transparency Rule."  Compl. ¶ 136.  Dismissal, or summary judgment in favor of Defendants, is warranted.

Take first the claims related to the supposed policy of abdication. This alleged policy is, of course, not something that was formally announced by the Bureau.  Rather, it is a term coined by Plaintiffs for a collection of disparate actions by the Bureau, including (apparently): consenting to stays of regulatory compliance deadlines in other litigation, issuing the IFR extending the regulatory compliance deadlines for regulated parties who did not benefit from the court-ordered stays, and issuing the Press Release about the Bureau's enforcement priorities. *See* Compl. ¶¶ 7, 60, 118-20.

The Court should rule in Defendants favor on these claims because the alleged policy is not a discrete agency action subject to APA review, *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890-91 (1990).  The APA provides (in relevant part) that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the

meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. But not everything that one could possibly label "agency action" counts as such under the statute. Among the limitations recognized by the Supreme Court—and, in turn, this Circuit—is that the agency action must be discrete (or, synonymously, specific) to fall under the ambit of the APA. *See National Wildlife*, 497 U.S. at 890-94 (1990) (explaining that "[u]nder the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm," "flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA"); *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) ("While a single step or measure is reviewable, an on-going program or policy is not, in itself, a final agency action under the APA.") (quotation marks omitted) (emphasis added).

The APA's discreteness requirement sinks Plaintiffs' abdication policy-related claims. The abdication policy claims are not challenges to a specific, discrete agency action. Instead, the term "abdication policy" is a term created by Plaintiffs to refer to a bundle of agency actions. *See* Compl. ¶¶ 7, 60, 118-20. And this Plaintiff-created bundle does not constitute a discrete agency action subject to APA review. *National Wildlife*, 497 U.S. at 890. Rather, the alleged abdication policy is an "on-going . . . policy" regarding the implementation of § 1071 which "is not, in itself, a 'final agency action' under the APA." *Cobell*, 240 F.3d at 1095. There's no doubt that the question of how to implement § 1071 is an ongoing policy issue, as the Bureau issued the Final Rule regarding the modification of the compliance dates subsequent to the filing of the complaint, issued an NPRM announcing an intention to revise the § 1071 Rule more generally, and must constantly balance its enforcement resources. Given that the claims at issue involve an

ongoing policy, ruling in Plaintiffs favor on these claims would impermissibly permit "general judicial review of the [Bureau's] day-to-day operations." *National Wildlife*, 497 U.S. at 899.

As for the IFR-related claim, it can be addressed briefly:  The claim should be dismissed because it is moot.  The IFR has been superseded by the Final Rule.  *See Ass'n of Am. Physicians & Surgeon*s, 746 F.3d at 472.

In any event, in their summary judgment brief, Plaintiffs offer no real argument in favor of Count Four.  They address it only in two sentences tacked on to the end of their discussion of Count Seven.  And the crux of their cursory discussion is this:  "this section's points [about the alleged arbitrariness and capriciousness of the Final Rule] apply with even greater force to the 2025 IFR and Press Release," which "contain even less explanation."  Revised SJ Memo. at 41. Plaintiffs do not, however, explain how their points about the Final Rule apply to the IFR and the Press Release or why.  *Id.*  Accordingly, the undeveloped argument that the IFR and Press Release are arbitrary and capricious is forfeited.  *See, e.g.*, *United States v. McGill*, 815 F.3d 846, 909 (D.C. Cir. 2016) (concluding that "appellants' woefully underdeveloped arguments are forfeited").  Thus, Plaintiffs' request for summary judgment on Count Four fails for that independent reason.  And for the reasons discussed above, the Court should dismiss Count Four or enter judgment on it in favor of Defendants.

## CONCLUSION

For the reasons stated above, the Court should dismiss Plaintiffs' Original and Supplemental Complaints or, in the alternative, enter summary judgment in favor of defendants on all of Plaintiffs' claims.  The Court should also deny Plaintiffs' motion for summary judgment.

DATED: November 21, 2025                    Respectfully Submitted,

                                            MARK PAOLETTA
                                            *Chief Legal Officer*
                                            DANIEL SHAPIRO
                                            *Deputy Chief Legal Officer*
                                            VICTORIA DORFMAN
                                            *Senior Legal Advisor*
                                            CHRISTOPHER DEAL
                                            *Deputy General Counsel for Litigation*
                                            ANDREA MATTHEWS
                                            *Assistant General Counsel*

                                            */s/ Justin M. Sandberg*
                                            JUSTIN M. SANDBERG
                                            *Senior Counsel*
                                            Consumer Financial Protection Bureau
                                            1700 G St. NW
                                            Washington, D.C. 20552
                                            Tel:  (304) 494-3213 (Sandberg)
                                            justin.sandberg@cfpb.gov

                                            *Counsel for Defendants Russell Vought and*
                                            *the Consumer Financial Protection Bureau*